IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HENRY UNSELD WASHINGTON, | |
| Plaintiff, | |
| v. | Civil Action No. 15-1031<br>Magistrate Judge Lenihan |
| ROBERT D. GILMORE, et al, | *Electronically Filed* |
| Defendants. | |

## DOC DEFENDANTS' BRIEF IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT

### *Procedural Background*

Plaintiff is a *pro se* inmate who is currently housed at SCI-Somerset. When plaintiff commenced this action on 8/7/15, he only named SCI-Greene Superintendent Gilmore. (ECF 1 and 5) In that Complaint, plaintiff claimed that prison officials, including RHU Sgt. Oswald, engaged in unwanted touching and banter of a sexual nature. (ECF 1, ¶17) Specifically, while escorting plaintiff to his cell (no date was given), Oswald allegedly rubbed plaintiff's buttock in an unwelcome way and made lewd sounds in plaintiff's ear, "simulating an orgasm". (ECF 1, ¶18) Plaintiff accused Doctors Jin and Dascani of making similar lewd sexual comments, asking plaintiff for sex and committing acts of sexual assault and harassment. (ECF 1, ¶ 16, 19, 23)

Plaintiff subsequently filed supplements, adding over 20 defendants and 100 pages of allegations. (ECF 9 and 12) In those filings, plaintiff described almost weekly medical visits in the 2013-2015 time frame and accused doctors or physician's assistants of declaring that he needed emergency medical care and then walking away, waiving their middle fingers, and leaving him sprawled or collapsed on the floor. (See e.g., ECF 9, ¶¶ 163, 178-80, 198, 204, 209, 235, 241-42, 299)[1]

After multiple amendments, plaintiff filed his Second Amended Complaint (the operative pleading) on 1/31/17. (ECF 76) The thrust of the Second Amended Complaint continued to be against 6 medical staff at SCI-Greene and the allegations bordered on delusional as virtually every medical staff member and officer in the RHU was accused of sexually propositioning plaintiff, "mimicking the sound of a woman experiencing a [sic] orgasm", inserting things in his rectum, and leaving him laying on a floor with semen running down his leg.

It its Amended Memorandum Order (ECF 100) adopting the Report and Recommendation dated 3/31/17 (ECF 96), the District Court dismissed all of plaintiff's claims against the DOC defendants with the exception of his claims for alleged sexual harassment/assault in violation of the Eighth Amendment against Oswald, Smith, Farrier and Stump at ¶¶ 174-80, 184 and 185 (pertaining to alleged incidents on 8/1/13, 4/2/15 and 7/14/15), and claims against CHCA Vihlidal at ¶¶209-210 (limited to the 2013-2015 time frame).

For the reasons stated below, the record in this case does not support plaintiff's Eighth Amendment claims against CHCA Vihlidal. Defendants believe

---

[1] The defendants were finally served on 3/28/16. (ECF 20)

that plaintiff's sexual assault/harassment allegations against Defendants Oswald, Smith, Farrier and Stump have no factual or legal basis, and are the product of plaintiff's admitted dementia. These incidents never happened and not surprisingly, were never reported. However, in light of plaintiff's deposition testimony describing improper sexual touching during at least one of the 3 incidents, and considering the Third Circuit's recent decision in Ricks v. Shover, 891 F.3d 468 (3d Cir. 2018), defendants will not ask the Court to entertain summary judgment on those claims. Defendants respectfully reserve the right to revisit this issue under Fed. R. Civ. Pr. 50 once plaintiff files his pretrial and identifies his evidence for trial.

## ARGUMENT

### I. Plaintiff Cannot Establish a Medical Care Claim under the Eighth Amendment against CHCA Vihlidal

According to the Second Amended Complaint, Plaintiff's claim against CHCA Vihlidal arises from 3 occasions when she "summoned" him for interviews concerning grievances. (ECF 76, ¶¶209-210) Plaintiff alleged his right eye was discharging pus and blood, he had no eyesight and was experiencing chest pain, but Ms. Vihlidal was deliberately indifferent to his situation. She declared he needed immediate emergency medical care but walked away, making an obscene gesture. (¶209-210) Plaintiff alleged these interviews occurred from August 2009 to July 2015, but the Court limited his claim to events between August 2013 and July 2015 (2 years before he filed this action).

At his deposition, Washington admitted that Vihlidal was not a doctor and did not come to treat him. (DOC 15, p. 40-41) He recalled meeting with CHCA Vihlidal about his grievances in which he complained about not getting sick call care. (DOC 15, p. 82-83) He did not ask to speak with her – rather, she had him called up from his cell in order to talk to her in the RHU conference room. (DOC 15, p. 84) She had copies of more than one grievance with her and copies of letters that people had sent her. (DOC 15, p. 83) He recalled Vihlidal responding to a lot of grievances over the years. *Id.*

However, plaintiff's recollection of detail from the Vihlidal interview or interviews was vague. Plaintiff initially believed he met with Vihlidal in 2013. He said she came down there once, and possibly another time with the warden, although he was not sure. (DOC 15, p. 85-86) He could not recall anything about that meeting except that he was feeling so bad he could barely walk. (DOC 15, p.87) Plaintiff says he was in pain and begging for medical care and Vihlidal left the room. (DOC 15, p. 88) Plaintiff then described this as being one meeting, which happened after his eye surgery in the fall of 2014, and his eye was discharging pus and blood. (DOC 15, p. 90-93) Plaintiff admitted he did not know what Ms. Vihlidal did after she left the room. (DOC 15, p. 93-94)

A failure to provide adequate medical care rises to the level of a Constitutional deprivation only when an inmate-plaintiff demonstrates that he had a "serious medical need" to which the defendants were "deliberately indifferent." Estelle v. Gamble, 429 U.S. 97, 105 (1976). The Third Circuit has expressly adopted this standard, stating that in order "[t]o demonstrate a *prima facie* case

4

of cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that defendants acted with 'deliberate indifference to his or her serious medical needs.'" Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002)(citing Estelle, 429 U.S. at 104).  *See also* Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

However, the Third Circuit has also made it clear that prison officials **who are not physicians** cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.  Once a prisoner plaintiff comes under the care of medical professionals, a non-medical prison official cannot be deliberately indifferent for failing to intervene in the medical treatment unless that non-medical official has reason to believe or actual knowledge that prison medical providers are mistreating the prisoner. Pearson v. Prison Health Services et al, 850 F.3d 526, 534 (3d Cir. 2017); Durmer at 69; Spruill v. Gillis, 372 F.3d 218, 236-37 (3d Cir. 2004). The Third Circuit has explained:

> [A] non-medical prison official will generally be justified in believing that the prisoner is in capable hands.  This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing the responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain the division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

Spruill, 372 F.3d at 236.

5

First, CHCA Vihlidal is a non-medical prison official.  Roberts v. Tretinick, 2014 WL 4218249 at *3-4 (W.D. Pa. 2014) (CHCA is an administrative official and subject to the limitations on suits for denial or delay of medical care against non-medical personnel).   As such, she is entitled to defer to the medical professionals, particularly when it comes to decisions about diagnoses and referrals to specialists, which are plaintiff's chief complaints.   See Lawson v. Phila. Prison System, 2011 WL 710489, *3 (E.D. Pa.); Roberts v. PA DOC, 2016 WL 4379031, *3 (M.D. Pa.); Davis v. Collins et al, 230 Fed. Appx. 172, 174 (3d Cir. 2007).

Second, there is no dispute that plaintiff was under the ongoing care of physicians and medical professionals (and there was no evidence of mistreatment).   In fact, as reflected in inmate Washington's progress notes and grievance responses, the medical contract provider had initiated a protocol for him to be visited by a clinician every 2 weeks because he was a hypochondriac and had abused the sick call system.  (DOC 1, ¶3; DOC 7, p. 5; DOC 13)   This started many years ago and was in place during 2013-2015.   (DOC 1, ¶3; DOC 13)   This did not prevent Inmate Washington from submitting multiple sick call requests, which he continued to do.  (DOC 1, ¶3)   As a result, the record shows that he often was seen by a doctor, PA or CRNP at least once a week and at times, even more frequently.   Id.

During these visits, the clinicians would try to elicit information from Washington about his issues – they wanted to see if he had any new symptoms

6

or complaints, which they would try to address.[2]  (DOC 1, ¶3; DOC 7, p. 3, 5; DOC 12, p. 2)  However, at almost every sick call visit, inmate Washington would reiterate his ongoing complaints and insist on treatment of his own choosing.  *Id.* He believed he was suffering from a variety of conditions and needed to see specialists, but the doctors and other medical staff found no clinical evidence supporting his claims.  *Id.*  Washington's own presentation did not suggest these problems, nor did the lab work correlate to his self-diagnosed conditions.  *Id.*

As explained by CHCA Nedra Rice (who was the Registered Nurse Supervisor at SCI-Greene and answered many of plaintiff's grievances along with CHCA Vihlidal[3]), the following is a summary of some of the typical entries repeated throughout plaintiff's chart in the 2013-2015 time frame (DOC 1 ¶6):

| | |
|---|---|
| 12/17/13 | Washington refused to have his annual physical exam (DOC 2, p. 1) |
| 12/18/13 | Dr Park notes several abnormal lab levels but they were not considered significant and were improved over his 8/7/13 lab results.  (DOC 2, p.1) |
| 12/19/13 | Washington refused to be seen by PA for his biweekly exam (DOC 2 p. 1) |
| 1/24/14 | Dr. Jin attempted to see Washington for his 2-week follow up and to respond to an illegible sick call slip.  Dr. Jin went to the cell but Washington would not acknowledge the doctor.  Dr. Jin noted that inmate Washington was non-compliant with medications and this was a repeat submission of the same sick call slip   (DOC 2, p.2) |

---

[2] An example of this was his right eye cataract condition and multiple ophthalmology consults. (DOC 3)  The medical staff at SCI-Greene determined that inmate Washington was a candidate for cataract surgery in 2014 and Dr. Jin wrote consults for him to be evaluated by specialists in the fall of 2014.   (DOC 1, ¶5 and DOC 3)   Inmate Washington had prompt cataract surgery on his right eye (in November 2014), and complications during the surgery required multiple return visits to the surgeon and a second surgical procedure in 2015.  (DOC 1, ¶5 and DOC 3)  These consults show prompt follow ups being scheduled by the doctors and staff at SCI-Greene.   *Id.*

[3] See e.g., DOC 7, p. 3;  DOC 8, p. 2;  DOC 9; DOC 13.

7

| | |
|---|---|
| 2/20/14 | PA Comer was able to conduct an evaluation and examination of inmate Washington and documented her findings (stable, and normal vitals – see DOC 2, pp. 3-6) |
| 4/8/14 | Inmate Washington was seen by PA Comer in response to his sick call request asking to see a gastroenterologist and complaining of stomach pain for years.  He claimed to have been diagnosed with Irritable Bowel Syndrome previously.  She made a referral to the medical doctor for evaluation.  (DOC 2, p. 7) |
| 4/14/14 | Inmate Washington submitted another sick call request and was seen by PA Comer.   She reviewed his chart and the list he submitted of 164 items that cause GI distress, along with a list of supplement foods he "needs"  (DOC 2, p. 7) |
| 4/18/14, 4/28/14, 4/30/14 and 5/2/14 | Drs. Jin and Park attempted to see inmate Washington about his request to see a gastroenterologist and optometrist but plaintiff refused to show up for sick call.   (DOC 2, pp.7-8) |
| 7/24/14 | Dr. Park notes that inmate Washington had refused examination 3 times in the past 3 weeks (on 3 sick call requests)   (DOC 2, p. 9) |
| 8/25/14, 8/28/14 | Washington approved by Dr. Jin for cataract surgery (DOC 2, p. 10-11; DOC 3, p. 1) |
| 9/19/14 | Washington was seen by Dr. Dascani and complained of having "Whipples Disease" and needs 6 months of Plaquenil and Doxycycline.  Washington told the Doctor that he had an article on Whipples Disease.   Dr. Dascani reviewed his lab work, and there were no abnormalities suggestive of Whipples disease.   (DOC 2, p. 12) |
| 9/22/14 | Dr. Park attempted to see inmate Washington in response to his sick call request but Washington ignored him, would not talk at all and walked away.   The same thing occurred with Dr. Park on 9/26 and 9/29/14.  The sick call requests listed the usual chronic complaints and demanded a high calorie diet, a urologist, otolaryngologist, dermatologist and cardiologist, but Washington refused to talk to the doctor (DOC 2, p. 12-13) |

8

| | |
|---|---|
| 10/24/14 | Dr. Dascani saw inmate Washington on sick call and Washington said "I'm fine but I want to see a gastroenterologist about Whipples disease".  Dr. Dascani noted: "Hypochondriac, Att. Seeking, no apparent acute problem"   (DOC 2, p. 14) |
| 11/24 and 12/23/14 | Dr. Jin sent Washington for post-cataract surgery follow up appointments.  Surgeon notes on 12/23/14 that "despite 3 sutures (where normally no stitch is needed or 1 stitch at most) there is iris eviscerated with externalization".  (DOC 3, pp. 3-5) |
| 1/21/15 | Washington tells the PA he wants to see a GI specialist for "IBD".  She notes her attempts were in vain when she tried to get him to respond as to whether anything is different such as changes in bowel movements, abdominal pain, blood in stool.  Washington would not answer questions and kept yelling.  She terminated the session due to his yelling and cursing.  (DOC 2, p. 15) |
| 2/3/15 | Washington had pre-op appointment with eye surgeon and second surgery on 2/16/15.  (DOC 3, pp. 6-7) |

(DOC 1, ¶6)

Above all, these entries reflect that inmate Washington would repeatedly submit sick call requests and then refuse to talk to or engage with nearly every physician who came to see him, including Doctors Jin, Park and Dascani.   (DOC 3, ¶4; DOC 7, p. 3)  Even so, the medical staff continued to respond to Washington's requests to make sure that there were no new problems.  *Id.*

In sum, it is clear that plaintiff was receiving medical care from many medical professionals.  (See e.g., DOC 7, p. 3; DOC 12, p. 2; DOC 3)  It is also clear they did not always agree with plaintiff, who has his own opinions and beliefs about his diagnoses and treatment plan.  But that disagreement does not amount to deliberate indifference – or mistreatment.  <u>Monmouth County</u>

Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)(an inmate's mere disagreement as to the proper course of medical treatment is insufficient to establish a constitutional violation)(citing Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).

Thus, CHCA Vihlidal's refusal to second-guess the decisions of Doctors Descani, Jin and Park, or the many Physician's Assistants who were following plaintiff and trying to address his concerns, does not amount to a violation of the Eighth Amendment.  Durmer, 991 F.2d at 69 "[p]rison administrators and the nursing staff of the prison infirmary cannot be found deliberately indifferent for failing to defer to an inmate's judgment about appropriate diagnostic care when it contradicts the recommendations of the treating physician."

Also, it would appear that plaintiff is suing Ms. Vihlidal for her role in investigating his grievances and explaining to him what the medical doctors had ordered (as many of his grievances show – see DOC 7-9 and 13).  However, that is insufficient to establish personal involvement under §1983.  *See* Mack v. Curran, 457 Fed. Appx. 141, 144 (3d Cir. 2012) (alleging that DOC officials had a responsibility and failed to take action based upon review of the plaintiff's grievance does not amount to personal involvement); Alexander v. Gennarini, 144 Fed. Appx. 924, 925 (3d Cir. 2005); Ziegler v. PHS, et al, 2013 WL 1971149, *5 and n.6 (W.D. Pa.); Jefferson v. Wolfe, 2006 WL 1947721, *17 (W.D.Pa.).

## II. Plaintiff Cannot Recover for Rude Gestures or Verbal Harassment

Plaintiff accuses Ms. Vihlidal of displaying her "middle finger" to him more than once. (DOC 15, p 92-93) He made this same allegation against nearly every one of the medical defendants. (See e.g., ECF 5)

Aside from the fact that he failed to exhaust such a claim (see below at §III), the conduct alleged (which Ms. Vihlidal denies – see ECF 115) does not rise to the level of an Eighth Amendment violation. Verbal harassment is not actionable under 42 U.S.C. §1983 and does not constitute a violation of the Eighth Amendment. Henry v. Gilara, 2017 WL 3424863 (W.D. Pa.); Rodriguez v. Wetzel, 2015 WL 1033842 at *8 (W.D. Pa. 2015); Luckey v. Martin, 2012 WL 665694 at *3 (D. N.J. 2012) (collecting cases); Tindell v. Wetzel, 2014 WL 3868240 at *9 (W.D. Pa. 2014) (collecting cases). Indeed, vulgar statements, even if sexual in nature, are not actionable under 42 U.S.C. §1983. Washington v. Hoffman, 2017 WL 4508859, *2-3 (W.D. Pa.), R&R adopted in 2017 WL 4508863.

## III. Plaintiff Failed to Properly Exhaust his Claims against Vihlidal

Further, it is clear that Ms. Vihlidal was the investigator in many of plaintiff's grievances (he admits as much); however, she is not named in any of his medical grievances. (DOC 1, ¶7 and DOC 4-13; DOC 15, p. 40-41) Accordingly, even if plaintiff's claims against Vihlidal could survive on this record, he failed to properly exhaust. See Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 2386 (2006) (proper exhaustion, in accordance with the DOC's grievance

11

procedures, is required, or else the grievant has procedurally defaulted and failed to exhaust his administrative remedies); Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004).

Pennsylvania's grievance procedure mandates that the inmate name all relevant persons. Mayo v. Wetzel, 2015 WL 4643137 (M.D. Pa.); Porter v. Beard, 2010 WL 2573878 (W.D. Pa.)  Thus, in order to properly exhaust as to a particular issue or claim **or a particular defendant**, the inmate-plaintiff is required to name the issue and future defendant in the operative grievance or else the grievance is procedurally defective as to that issue, claim, or future defendant. Boyd v. U.S., 396 Fed. Appx. 793, 796 (3d Cir. 2010); Spruill, 372 F.3d at 234 (inmate-plaintiff is required to name in his grievance individuals who are later sued or else grievance is procedurally defective as to those individuals).

WHEREFORE, Defendants submit that judgment should be entered in favor of Defendant Vihlidal and against Plaintiff.

                              Respectfully submitted,

                              JOSH SHAPIRO
                              Attorney General

By:   /s/ Mary Lynch Friedline
        MARY LYNCH FRIEDLINE
        Senior Deputy Attorney General
        PA ID. #47046

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

July 13, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2018, I electronically filed the foregoing DOC Defendants' ***Brief in Support of Partial Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system.  This document will be mailed via U.S. mail to the following non CM/ECF participants:

**HENRY UNSELD WASHINGTON**
AM-3086
S.C.I. Somerset
1600 Walters Mill Rd
Somerset, PA 15510

                              By:   /s/  Mary Lynch Friedline
                                        MARY LYNCH FRIEDLINE
                                        Senior Deputy Attorney General

Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222