# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HENRY UNSELD WASHINGTON, ) | |
| ) | Civil Action No.  15-1031 |
| Plaintiff, ) | |
| ) | District Judge David S. Cercone |
| v. ) | Magistrate Judge Lisa Pupo Lenihan |
| ) | |
| ROBERT D. GILMORE, *Warden*, ) | |
| TRACY SHAWLEY, *Warden's* ) | |
| *Assistant*, S.P. DURCO, *RHU* ) | ECF Nos. 144, 148, 163 |
| *Commander*, P.E. BARKEFELT, *RHU* ) | |
| *Lieutenant*, A.J. MORRIS, *Lieutenant*, ) | |
| C. WILLIAMS, *Lieutenant*, G. ) | |
| GRABLE, *Sergeant*, J.M. SMITH, ) | |
| *Sergeant*, ROBERT NELSON, ) | |
| *Corrections Officer*, T.S. OSWALD, ) | |
| *Corrections Officer*, L. COMER, ) | |
| *Corrections Officer*, T.I. BENNETT, ) | |
| *Property Officer/Corrections Officer*, ) | |
| R. HENDRICKS, *Corrections Officer*, ) | |
| J. CODDY, *Corrections Officer*, J. ) | |
| HEGETER, *Corrections Officer*, D. ) | |
| FARRIER, *Corrections Officer*, M. ) | |
| STUMP, *Corrections Officer*, G. ) | |
| TAIT, *Corrections Officer*, J.D. ) | |
| SUHAN, *Corrections Officer*, IRMA ) | |
| VIHLIDAL, *Health Care* ) | |
| *Administrator*, B. JIN, *Medical* ) | |
| *Director*, M. PARK, *Doctor*, P. ) | |
| DASCANI, *Doctor*, M. COMER, *P.A.*, ) | |
| E. MATTES, *P.A.*, E. MWAURA, ) | |
| *P.A.*, P. DENNISON, *Corrections* ) | |
| *Officer*, ) | |
| ) | |
| Defendants. ) | |

1

# REPORT AND RECOMMENDATION

## I. RECOMMENDATION

For the reasons stated herein, it is respectfully recommended that the Partial Motion for Summary Judgment filed by the DOC Defendants on behalf of Defendant Vihlidal (ECF No. 144) be granted and that the Motion for Summary Judgment filed by the Medical Defendants (ECF No. 148) be granted. It is further recommended that Plaintiff's Motion for Summary Judgment (ECF No. 163) be denied.

## II. REPORT

Plaintiff Henry Unseld Washington ("Plaintiff") is an inmate currently in the custody of the Pennsylvania Department of Corrections and confined at SCI-Somerset. He initiated this action on August 7, 2015 (ECF No. 1), and eventually filed the operative Second Amended Complaint on January 31, 2017 (ECF No. 76). Following the filing of Motions to Dismiss by the twenty-seven (27) named defendants (ECF Nos. 78, 89), only eleven (11) of those defendants remain in this action after the Court granted in part and denied in part those Motions to Dismiss on September 26, 2017 (ECF No. 100). The remaining defendants include J.M Smith, T.S. Oswald, D. Farrier, M. Stump and Irma Vihlidal ("DOC Defendants") and Dr. Jin, Dr. Park, Dr. Dascani, PA Mattes, PA Mwaura and PA Comer ("Medical Defendants"). The remaining claims against these defendants include three alleged incidents of sexual harassment/assault against DOC Defendants Oswald, Smith, Farrier and Stump, and denial of medical care against the Medical Defendants and DOC Defendant Vihlidal.

On July 13, 2018, the DOC Defendants filed a Partial Motion for Summary Judgment on behalf of Defendant Vihlidal (ECF No. 144),[1] to which Plaintiff filed responses in opposition (ECF Nos. 159-61), and to which the DOC Defendants filed a counter-response (ECF No. 162). On July 16, 2018, the Medical Defendants filed a Motion for Summary Judgment (ECF No. 148), to which Plaintiff also filed responses in opposition (ECF Nos. 159-61). Plaintiff also filed his own Motion for Summary Judgment on November 23, 2018 (ECF No. 163), to which the Medical Defendants filed a response in opposition (ECF No. 165), and to which Plaintiff filed a counter-response (ECF No. 166). The Motions are now ripe for review.

### A. Factual Background

Plaintiff has been continuously in the custody of the Pennsylvania Department of Corrections since 1978. (Exh. C[2], p.9.) The Third Circuit has described Plaintiff's long history in the Pennsylvania prison system as "characterized by repeated transfers, long stints in restricted housing and/or solitary confinement, and, he claims, sustained abuse." Washington v. Grace, 2011 WL 4448572, at *1 (3d Cir. Sept. 23, 2011). He has engaged in decades long letter-writing campaign to authorities and celebrities – mostly African American politicians and media figures – about this alleged abuse for which he claims he is retaliated on a daily basis.[3]

---

[1] Counsel for the DOC Defendants agree that the sexual harassment/assault claims asserted against DOC Defendants Oswald, Smith, Farrier and Stump will have to proceed to trial.

[2] Exhibit C to the Medical Defendants' Motion for Summary Judgment is Plaintiff's deposition testimony. It is found on the docket at ECF No. 150 and will be cited to herein as "Exh. C" and followed by the deposition page number that contains the referenced information.

[3] These include letters to Pope John Paul, Mother Theresa, Nelson and Winnie Mandela, Bill and Hillary Clinton, George W. Bush, Barak and Michelle Obama, President Trump and Vice President, Loretta Lynch, Janet Reno, Eric Holder, and Johnnie Cochran, as well as United States and Pennsylvania senators and representatives. (ECF No. 76, ¶¶ 274-75.)

The events at issue in this action occurred while Plaintiff was confined at SCI-Greene, where he arrived in August 2009 and remained in solitary confinement until he was transferred to SCI-Somerset in July 2015, except for a short stint in early 2014 when he was sent to the SNU at SCI-Camp Hill, which Plaintiff describes as a "mental institution." (Exh. C, pp.11-12, 77-78.) Plaintiff commenced this action on August 7, 2015, shortly after arriving at SCI-Somerset. (ECF No. 1.) In his multiple complaints filed in this case, Plaintiff accuses the Defendants of making lewd sexual comments, asking him for sex and committing acts of sexual assault and harassment. *See, generally*, (ECF Nos. 5, 58, 76.) He also claims that during the almost weekly medical visits at his cell in the August 2013 to July 2015 time frame at issue herein, the Medical Defendants refused to examine him, treat him or provide him with any sort of medical care whatsoever, describing repeated incidents where they allegedly told him that he needed emergency medical care and then walked away waiving their middle fingers and leaving him sprawled or collapsed on the floor in pain. Id. The following is a summary of Plaintiff's medical situation as he described it in his deposition testimony.

In his deposition, Plaintiff acknowledged that he is in the initial stages of dementia. (Exh. C, pp.32, 40, 45.) He was unclear as to when it started but guessed that it was around 2009. Id., pp.45, 56-57. He also admitted to speaking with mental health professionals at the prison "quite frequently" about it. Id., p.56. Plaintiff stated that he suffers from numerous medical problems, id., p.15, including, but not limited to, partial blindness in his right eye,[4] id.,

---

[4] Plaintiff underwent cataract surgery on his right eye in the fall of 2014. (Exh. C, pp.18-21.) He said that the surgery helped for a couple of weeks but then his eyesight started to deteriorate and a couple of times he lost complete eyesight. Id., p.21. He was told by the optometrist at SCI-Somerset that there is nothing that can be done to save the vision in his right eye and that eventually he will go blind. Id., pp.22-25. According to Plaintiff's medical records, complications during the cataract surgery required multiple return visits to the surgeon and a second surgical procedure in 2015. (ECF No. 147-3.)

pp.17-18; voice trouble,[5] id., pp.27-28; digestive issues, id., p.31; breathing problems, id, pp.45-47; dizziness, id., p.47; discharge of pus, blood and semen, id., pp.50-51; sudden onset sleepiness, id., pp.52-55; swollen ankles and inflamed joints, id., pp.57-58; continuous nose bleeds, id., p.60; testosterone deficiency, id., p.61; urethral stricture, id., p.63; irreversible foot fungus, id., p.64; and intense chest pain, id., p.66.  Plaintiff also stated that he was told he suffered from two heart attacks while he was a confined at SCI-Huntington.  Id., p.70.  Despite the number of issues from which he claims to suffer, Plaintiff stated that he was on only two medications while he was at SCI-Greene, and both were for blood pressure.  Id., pp.14-17.

Plaintiff described his digestive issues as "vicious," and claimed that there are very few foods that he can eat.  Id., pp.31-32.  He said that this is a result of him having "Whipple's disease,"[6] and, when asked to explain what it was, Plaintiff stated, "It's where you --- your digestive system start[s] to reject a lot of stuff.  And so it affects your memory.  I'm in the first stage of dementia.  Your eyesight, your circulatory system, and a bunch of other stuff.  And you might can tell here that my joints are all messed up plus my ankles --- I got large ankles and my arm --- can't straighten my arms out.  That's --- so all those are started to be in effect on me."

---

[5] Plaintiff stated that was attacked by guards at SCI-Greene in 1997, and, ever since then he periodically throughout the day can barely raise his voice above a whisper.  (Exh. C, pp.27-28.)  He said that he is "always complaining to the doctor that I'm losing my voice and can barely talk," but that no one has said or done anything about it.  Id., pp.27-30.

[6] Plaintiff claims, without evidence, that he was diagnosed with Whipple's Disease in 2016.  (Exh. C., pp.32-33.)  However, his medical records reveal that on September 19, 2014, he was seen by Dr. Dascani and complained of having Whipple's Disease and needing six months of Plaquenil and Doxycycline.  (ECF No. 147-2, p.12.)  Dr. Dascani reviewed Plaintiff's lab work and found no abnormalities suggestive of Whipple's Disease.  Id.  On October 24, 2014, Dr. Dascani saw Plaintiff on sick call and Plaintiff said "I'm fine but I want to see a gastroenterologist about Whipple's Disease."  Id., p.14.  Dr. Dascani noted:  "Hypochondriac, Att. Seeking, no apparent acute problem".  Id.

5

Id., pp.32. Plaintiff stated that he has frequent diarrhea caused by the food that he is given to eat. Id., p.58.

According to Nedra Rice (formerly Grego), who worked as a Registered Nurse Supervisor at SCI-Greene from 2008 until June 2016, there came a time where the medical contract provider initiated a protocol for Plaintiff to be visited by a clinician every two weeks because he was a hypochondriac and had abused the sick call system. (ECF No. 147-1, ¶¶ 1, 3). This protocol was initiated many years ago and was in place during 2013 through 2015, but it did not prevent Plaintiff from submitting multiple sick call requests, which he continued to do. Id., ¶ 3. As a result, Plaintiff was seen by a doctor, PA or CRNP at least once a week and at times, even more frequently. The clinicians would try to elicit information about his issues – to see if he had any new symptoms or complaints – which they would try to address. Most of the time, Plaintiff would reiterate his ongoing complaints and insist on treatment of his own choosing. He believed he was suffering from a variety of conditions and needed to be seen by specialists, but the doctors and other medical staff found no clinical evidence supporting his claims. Plaintiff's own presentation did not suggest these problems, nor did the lab work correlate to his self-diagnosed conditions. Id.

Nedra Rice also attests that Plaintiff would repeatedly submit sick call requests and then refuse to talk to or engage with nearly every physician who came to see him, including Doctors Jin, Park and Dascani. Those refusals, and his refusals of physical examinations, were documented. However, the medical staff would continue to respond to Plaintiff's requests to make sure that there were no new problems. Id., ¶ 4.

When asked in his deposition whether the Medical Defendants would ever come to his cell and ask whether he had any new complaints Plaintiff answered no then said that he was not

going to give a yes or no answer to the question. (Exh. C, pp.35-36.) Eventually, in response to the question "if it was a new problem, were you examined," Plaintiff said that every time they would come to his cell door he would tell them what was wrong with him but that they never examined him. The question was asked at least four times and Plaintiff gave the same response each time. Id., pp.36-38.

When asked whether there ever came a time when someone from the medical staff told him that he was going to be checked on every few days without him having to put in a sick call slip, Plaintiff would not directly answer the question. Id., pp.39-40. He was asked whether any of the Medical Defendants would come to his cell even when he did not put in a sick call slip, and Plaintiff again would not directly answer the question, instead repeating "I put in a sick call slip two and three times a week and the majority of the time they wouldn't come." Id., pp.41-43. When asked what would happen when they would come to his cell, Plaintiff said that "the majority of the time they just leave me there in pain. I ain't never got no medicine, no diet or nothing." Id., p.44.

Plaintiff eventually admitted in his deposition that all of the Medical Defendants had come to his cell at least once, but he said that none of them would examine him or talk to him about his lab work. Id., pp.71-74. He also said that he never refused to see them or to be physically examined. Id., pp.73-74. When asked if he ever filed a grievance saying that he was in excruciating pain, Plaintiff said that he was sure he filed more than one saying that and that the pain was "pretty much in my digestive tract and sometimes my testicles would be so sore I couldn't touch them . . . . my toes were sometimes bad I c[ould] barely walk." Id., p.81.

The DOC Defendants submitted nine grievances Plaintiff filed about his medical care in the mid-2013 to July 2015 timeframe. (ECF Nos. 147-4 through 147-12.) Nurse Rice and

going to give a yes or no answer to the question. (Exh. C, pp.35-36.) Eventually, in response to the question "if it was a new problem, were you examined," Plaintiff said that every time they would come to his cell door he would tell them what was wrong with him but that they never examined him. The question was asked at least four times and Plaintiff gave the same response each time. Id., pp.36-38.

When asked whether there ever came a time when someone from the medical staff told him that he was going to be checked on every few days without him having to put in a sick call slip, Plaintiff would not directly answer the question. Id., pp.39-40. He was asked whether any of the Medical Defendants would come to his cell even when he did not put in a sick call slip, and Plaintiff again would not directly answer the question, instead repeating "I put in a sick call slip two and three times a week and the majority of the time they wouldn't come." Id., pp.41-43. When asked what would happen when they would come to his cell, Plaintiff said that "the majority of the time they just leave me there in pain. I ain't never got no medicine, no diet or nothing." Id., p.44.

Plaintiff eventually admitted in his deposition that all of the Medical Defendants had come to his cell at least once, but he said that none of them would examine him or talk to him about his lab work. Id., pp.71-74. He also said that he never refused to see them or to be physically examined. Id., pp.73-74. When asked if he ever filed a grievance saying that he was in excruciating pain, Plaintiff said that he was sure he filed more than one saying that and that the pain was "pretty much in my digestive tract and sometimes my testicles would be so sore I couldn't touch them . . . . my toes were sometimes bad I c[ould] barely walk." Id., p.81.

The DOC Defendants submitted nine grievances Plaintiff filed about his medical care in the mid-2013 to July 2015 timeframe. (ECF Nos. 147-4 through 147-12.) Nurse Rice and

Defendant Vihlidal answered most of Plaintiff's grievances, and in responding to his grievances, they would review his chart and discuss his care with the medical staff. (ECF No. 147-1, ¶ 7.) Nurse Rice states that she and Defendant Vihlidal were well aware of the medical staff's attempts to work with Plaintiff and his refusal to accept their recommendations and explanations when those explanations conflicted with his own self-diagnosis or conclusions about what treatment was proper. Id.

In addition to compensatory and punitive damages, Plaintiff requests that he be granted the following relief: laser eye surgery at Will's Eye Clinic in Philadelphia, Pennsylvania; medical care by an ophthalmologist and podiatrist at John Hopkins University Hospital; placement in John Hopkins University Hospital until he is "convinced all of his health problems have been cured or corrected"; sick call visits and medication free of charge; choice of diet supplements; doctor visits three days per week without having to submit a sick call request; each sick call request responded to in one day; and no limit on in-cell storage space. (ECF No. 76, ¶¶ 251-8.)

### B. Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. Nat'l State Bank v. Fed.l

Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing Celotex, 477 U.S. at 323-25). Once that burden has been met, the nonmoving party may not rest on the allegations in the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e) (1963). *See also* Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing Celotex, *supra*).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In Anderson, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. …[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Id. at 249-50 (internal citations omitted).

### C. Discussion

#### 1. Eighth Amendment Standards

Plaintiff claims that the Medical Defendants and DOC Defendant Vihlidal denied him medical care in violation of the Eighth Amendment. The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994)

(internal quotation marks and citations omitted).  In the context of medical treatment, an inmate must prove that: (1) he was suffering from a "serious medical need;" and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

As to the first element, a medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  The second element of deliberate indifference may be shown by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury.  Id. at 346-47 (citations omitted).  A prisoner must demonstrate that the official acted with more than mere negligence.  Estelle, 429 U.S. at 105-106.  To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety.  Farmer, 511 U.S. at 837.  The Supreme Court has explained that "deliberate indifference entails something more than mere negligence" and is a subjective standard that requires the official to both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and to "also draw the inference."  Farmer, 511 U.S. at 835-37.

The Third Circuit has found deliberate indifference in a variety of contexts including where "(1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs."  Pearson v. Prison

Health Service, 850 F.3d 526, 538 (3d Cir. 2017) (citing Monmouth County Corr. Inst. Inmates, 834 F.2d at 347).

### 2. **Denial of Medical Care v. Inadequate Medical Care**

The Medical Defendants argue that Plaintiff's Second Amended Complaint does not allege a complete denial of medical care, but instead "depends upon inadequate medical care." (ECF No. 149, p.12.)  The undersigned, however, disagrees with this interpretation of Plaintiff's Second Amended Complaint.  The claims against the Medical Defendants are premised on the very fact that they refused to provide him with any medical care whatsoever in times that he believed that he was in imminent danger and in need of emergency care.  *See, e.g.*, (ECF No. 76, ¶¶ 88, 92) (Drs. Jin and Park walked away while Plaintiff was "clutching his chest with both hands" and "gasping for air"); (ECF No. 76, ¶¶ 98, 128) (Drs. Jin and Dascani walked away "holding [their] penis" leaving Plaintiff in pain and "begging for care"); (ECF No. 76, ¶¶ 124-25) (PA Mattes walked away while Plaintiff was in in pain and too weak to rise to his feet, "struggling to breath"); (ECF No. 76, ¶¶ 154-55) (PA Mwaura walked away flicking off Plaintiff leaving him with infected nails and no medicine for pain); (ECF No. 76, ¶ 102) (PA Comer walked away leaving Plaintiff "begging her for medical care" as he "struggled to breath"); (ECF No. 76, ¶¶ 209-10) (CHCA Vihlidal walked away flicking off Plaintiff leaving him lying on the floor in need of immediate emergency care).

> The Third Circuit recently explained that
>
> [a] delay or denial of medical treatment claim must be approached differently than an adequacy of care claim.  [U.S. ex rel. Walker v.] Fayette Cty., 599 F.2d [573,] 575 n.2 [(3d Cir. 1979)].  Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment involves only one subjective inquiry – since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim.  Absent that objective inquiry, extrinsic proof is not

necessary for the jury to find deliberate indifference in a delay or denial of medical treatment claim. All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors. *See, e.g.*, Durmer [v. O'Carroll], 991 F.2d [64,] 68-69 [(3d Cir. 1993)]; United States v. Michener, 152 F.2d 880, 885 (3d Cir. 1945) ("[I]t is for the jury to determine the weight to be given to each piece of evidence . . . particularly where the question at issue is the credibility of the witness.").

Pearson v. Prison Health Service, 850 F.3d 526, 537 (3d Cir. 2017).

While the record paints a very different picture of Plaintiff's medical situation, mainly that he disagrees with his medical diagnoses and the characterization of his medical complaints, his primary complaint against the moving Defendants is that they did not provide him with any medical care whatsoever as a result of him filing grievances and lawsuits and his continuous communications with authorities, the court and the Pennsylvania Department of Corrections Central Office. (ECF No. 76, ¶ 278.) Therefore, that is the standard the undersigned will use when evaluating the merits of his claims.

### 3. Serious Medical Need

It is not disputed that Plaintiff claims to suffer from a litany of medical issues, many of which he discussed in his deposition and which are set forth in the factual background section of this Report. What is disputed, however, is the actual existence of those medical issues. Plaintiff is no stranger to this Court, nor are his continuous complaints that he is on death's doorstep. In fact, the Court has been well aware of Plaintiff's complaints about his medical care, or lack thereof, since he initiated Washington v. Folino, No. 11-1046 (W.D. Pa.) on August 12, 2011. In that case, he complained that he was suffering from some of the same medical issues as here, such as physical collapse, a thunderous heartbeat, intense chest pain, dizziness, the inability to speak, loss of memory, difficulty in standing, etc. Id., ECF Nos. 3, 16, 196.

Following a phone conference held in that case on May 21, 2012, wherein the undersigned patiently listened to all of Plaintiff's complaints, Plaintiff filed a motion for another phone conference alleging that he had been adversely treated by medical personnel following the last one. Id., ECF No. 155. In response, counsel for the DOC Defendants in that case filed a declaration by CHCA Irma Vihlidal, who is also a defendant in this case, wherein she described Plaintiff as a "difficult inmate" who claims that "he has various diseases/ailments" which are "generally determined to be completely unfounded." Id., ECF No. 161-1, pp.2-3, ¶¶ 3-5. She also stated that Plaintiff is "automatically seen for sick call every two week unless he refuses to be seen" and he "repeatedly refuse[s] recommended treatment." Id., ¶¶ 4-6. When he does permit himself to be examined, "objective findings do not support his claims of suffering from these various diseases/ailments." Id., ¶ 5. For example, at that time, he believed he had Whipple's Disease, but she stated that there was no objective medical evidence indicating that he did have the disease. Id., ¶ 5. He was also "generally obsessed with Crohn's disease and other digestive disorders," but there were no objective indications that Plaintiff had Crohn's disease or any other malabsorption or digestive disorder. Id., ¶¶ 5, 8. She also listed numerous recommended treatments, bloodwork, and lab tests that he refused to undergo, as well as repeated refusals to be examined by medical professionals. Id., ¶¶ 6-12. She did note, however, that he has a history of high blood pressure and is on medication for that condition. Id., ¶ 19. Importantly, she stated that Plaintiff "is routinely examined in relation to his medical issues, both real and imagined. He receive[s] treatment as is deemed medical[ly] necessary" and "as needed for his actual, diagnosed medical issues." Id., ¶¶ 21-22.

In this case, most of the health problems Plaintiff alleges are symptoms of what he believes is Whipple's Disease.[7] (Exh. C, p.32.) Plaintiff stated in his deposition that he was diagnosed with Whipple's Disease in 2015 or 2016 when he returned to SCI-Greene for a brief period of time to appear for a case in county court, but he claimed that he suffered from its effects long before he was diagnosed. Id., pp.32-33. Despite Plaintiff's claim that he was diagnosed with Whipple's Disease, he provided no proof of this to the Court and his medical records spanning the time period in question indicate that he did not have the disease.[8] Plaintiff's medical records show that he had bloodwork performed in August 2013, December 2013, March 2014, and June 2015. (ECF No. 150-2, pp.15-25.) When he complained to Dr. Dascani in September 2014 that he had Whipple's Disease, after reading an article about it, Dr. Dascani reviewed Plaintiff's lab work and noted that there were no abnormalities suggestive of Whipple's Disease. (ECF No. 147-2, p.12.) Furthermore, there is nothing in the medical records to indicate that Plaintiff even suffered from the effects of Whipple's Disease.

The undersigned has reviewed all of the various materials that Plaintiff has submitted, along with his medical records, and nothing therein shows that Plaintiff suffered from an actual serious medical condition of which he complained during the time period in question with the exception of his eye cataracts for which he was evaluated by outside specialists and received

---

[7] According to the Mayo Clinic's website, Whipple's Disease is a rare but treatable bacterial infection that most often affects the joints and digestive system. Whipple's Disease interferes with normal digestion by impairing the breakdown of foods, such as fats and carbohydrates, and hampering the body's ability to absorb nutrients. It can also infect other organs, including the brain, heart and eyes. Without proper treatment, Whipple's Disease can be serious or fatal. However, it is extremely uncommon, affecting fewer than 1 in 1 million people. www.mayoclinic.org (last visited on Feb. 28, 2019).

[8] The Defendants did not provide the Court with Plaintiff's medical records beyond July 2015, when he was transferred to SCI-Somerset, and Plaintiff did not provide any evidence to support his claim that he was in fact diagnosed with Whipple's Disease in 2015 or 2016.

surgical intervention in 2014 and 2015. *See* Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003) ("[T]his Court has defined a medical need as serious if it has been diagnosed by a physician as requiring treatment.") The only evidence of a serious medical need during the time period at issue is Plaintiff's own characterization of his medical complaints, which the contemporary and objective evidence does not substantiate. Plaintiff's refusal to accept the medical diagnoses of medical professionals does not elevate what appears to be hypochondria into a serious medical need requiring unnecessary treatment. At most, Plaintiff has only alleged that the moving Defendants in this case differ with him on whether he needs treatment for medical problems that he has self-diagnosed and for which there is no clinical evidence to support. Because there is no evidence from which a jury could find that he suffered from a serious medical need during the time period in question, or that they were deliberately indifferent to his general health and well-being as discussed in further detail below, summary judgment in favor of the moving Defendants is appropriate.

    4. **Deliberate Indifference**

        a. **The Medical Defendants**

As previously discussed in this Report, Plaintiff claims that the Medical Defendants did absolutely nothing for him and would not provide him with medical care for numerous reasons, but mainly because of his engaging in his right to access the courts and complaining to outside authorities.

Plaintiff's Second Amended Complaint is filled with incredible salacious allegations accusing the Medical Defendants of sexually assaulting/harassing and verbally abusing him, which the undersigned believes to be the manifestation of a mental health disorder. *See* ECF No. 76. For example, he claims that Dr. Jin would tell Plaintiff that he was going to give him "a

good fucking" and spoke to Plaintiff while holding and rubbing his penis, id. ¶¶ 89-91; told him that he was going to give him "some dick" to "feel better," id. ¶ 94; mimicked having an orgasm while instructing Plaintiff to bend at the waist and spread his butt cheeks, id. ¶ 96; mimicked kissing Plaintiff while rubbing his own penis, id. ¶ 97; said "baby, are you ready for daddy to give you a good fucking, you'll feel better," id. ¶ 99; asked Plaintiff to show him his asshole and then said "daddy want to see your asshole, baby," id. ¶ 101; wet his lips and rubbed his chest while "gawking at the sight of Plaintiff's penis" and making sounds like a female having an orgasm, id. ¶ 103; told Plaintiff to show him his "black ass" and mimicked kissing him, id. ¶ 110; and told him to spread his butt cheeks while saying "look at that pussy . . . what a gorgeous shaped ass . . . . I will put my dick in your asshole and you'll be just fine," id. ¶ 122.

He further claims that while holding a scalpel, Dr. Park told him that he was going to slit his throat the first chance he got and would always walk away from his cell while Plaintiff was gasping for air, struggling to breath, begging for medical care, too weak to stand, and in agonizing pain and discomfort. Id., ¶¶ 100, 105-09, 111-20, 123, 129-30, 134, 140, 149-53. Plaintiff also claims that Dr. Park told him that he was not going to provide him with medical care because he wanted him to suffer and said things like "they could not pay me to provide you with medical care," "hurry up and die," "I don't give a damn if [your medical problems] cause your death, I will not provide you medical care, so stop asking," and "you're shit out of luck if you are expecting me to help you, you can die for what I care." Id., ¶¶ 126, 131-33, 138, 143.

Plaintiff claims that Dr. Dascani would also rub his penis and say things such as "show me that ass," id., ¶¶ 136, 139, and, he claims that PAs Mattes and Mwaura would walk away from him flicking him off while he was in pain and discomfort, begging for care, unable to see

16

out of his right eye, discharging pus and blood, and told him that they wanted him to suffer. Id., ¶¶ 137, 141-42, 144-45, 147-48, 154-69.

According to Dr. Jin, the medical department decided to see Plaintiff approximately once a week because Plaintiff was submitting sick call slips every day. When they would see Plaintiff, they would ask whether his condition had changed, and if it had then he would be examined. If not, his complaints would be dealt with and discussed with him. (ECF No. 150-5, ¶ 8.) He also states that Plaintiff was on the proper medications for his conditions and did not require any additional medications or outside consultation apart from an ophthalmology consult and eventual surgery for his cataracts. Id., ¶¶ 9-10. There were never any budget constraints placed on Plaintiff's care, he just did not require additional care, medications or testing. Id., ¶ 13.

Dr. Jin also states that he never refused to treat or exam Plaintiff, but there were several times that he would come to his cell and Plaintiff would refuse to be seen or treated. Id., ¶ 11. He never saw Plaintiff gasping for air or clutching his chest, struggling to speak, or in agonizing pain, and he never saw him too weak to stand or walk. Id., ¶ 14. Dr. Jin claims that he used his best medical judgment when determining what treatment Plaintiff should receive for his complaints and that everything was done appropriately to diagnose and treat his medical complaints. Id., ¶¶ 16-17.

A review of Plaintiff's medical records from August 2013 to July 2015 show that Plaintiff was seen at his cell in the RHU by a medical professional at least once a week, and most of the time more often than that.⁹ (ECF Nos. 147-2, 150-2.) There were numerous times,

---

⁹ According to his medical records, Plaintiff was seen, or someone attempted to see him, approximately 40 times from the time he arrived at SCI-Greene in August 2013 to the end of that year, and he refused to be seen at least ten of those times. This appeared to be a similar pattern

however, that Plaintiff refused to be seen or examined. In fact, it appears that the specific dates Plaintiff cited in his Second Amended Complaint, when the Medical Defendants allegedly refused to treat him, are the dates he actually refused to be seen or comply with examinations. While Plaintiff maintains that his pleas for medical care were in vain, his medical records demonstrate that most of the time he never had any new or acute complaints that required an examination and they don't indicate that he was ever in distress.[10]

It is evident from the record that Plaintiff was provided with continuous, on-going care during the time period at issue, just not the care that he wanted or he thought he needed for his self-diagnosed medical problems that were never substantiated with clinical evidence. His displeasure with the care and the diagnoses that he did receive does not rise to the level of a constitutional violation and there is simply no evidence from which a jury could find deliberate indifference in this record apart from Plaintiff's own fantastical and likely delusional allegations, which the Court can dismiss as "clearly baseless," especially now that the record has been fully developed. See Denton v. Hernandez, 504 U.S. 25, 32 (1992). Thus, the Medical Defendants Motion for Summary Judgment should be granted.

### b. Defendant CHCA Vihlidal

With respect to Defendant CHCA Vihlidal, Plaintiff admitted in his deposition to knowing that she was not a doctor. (Exh. C, pp.40-41, 91.) However, he claims that on three separate unspecified occasions from August 2009 to July 2015, she summoned him to come

---

for 2014 and 2015, but the undersigned cannot determine the exact number of times he was seen or refused to be seen in those years because the Court was not provided with all of Plaintiff's medical records for that time period.

[10] When Plaintiff was questioned about this in his deposition, he stated that he considered every problem to be a new problem until he was no longer sick or in pain from it. (Exh. C, pp. 35-36.)

before her in the RHU conference room and then did nothing in response to his medical complaints. He states that on one occasion[11] he had pus and blood discharging from his eye, and she declared that he needed immediate emergency medical care but then walked away holding out her middle fingers and leaving him lying on the floor begging for medical care. (ECF No. 76, ¶¶ 209-10); (Exh. C, pp.89, 90, 92-93.) In his deposition, Plaintiff could not provide any more specific details about when these three interactions occurred and what exactly occurred during them except for the fact that she didn't get him any help after he told her what was wrong with him.

The law with respect to prison administrators is that they cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). "If a prisoner is under the care of medical experts . . . a non-medical prisoner official will generally be justified in believing that the prisoner is in capable hands." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (discussing Durmer, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirements of deliberate indifference." Id. at 236.

Plaintiff was under the continuous care of multiple medical professionals while he was at SCI-Greene from August 2013 to July 2015. Pursuant to an agreement, he was being seen on an on-going basis due to the amount of sick call slips he was filing, and there is no evidence in the record indicating that he was ever in need of immediate medical care. There is also nothing in

---

[11] Plaintiff could not remember the exact date of this interaction but said that he thought it was sometime after his eye surgery that he had in the fall of 2014. (Exh. C, p.91.)

the record that would lead a reasonable jury to find that Defendant Vihlidal was not justified in believing that Plaintiff was in capable hands. Her Motion for Summary Judgment should therefore be granted.

### III.     CONCLUSION

For the reasons stated herein, it is respectfully recommended that the Partial Motion for Summary Judgment filed by the DOC Defendants on behalf of Defendant Vihlidal (ECF No. 144) be granted and that the Motion for Summary Judgment filed by the Medical Defendants (ECF No. 148) be granted. It is further recommended that Plaintiff's Motion for Summary Judgment (ECF No. 163) be denied.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. §636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, Plaintiff shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Plaintiff's failure to file timely objections will constitute a waiver of his appellate rights.

Dated: March 1, 2019.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Cc:     Henry Unseld Washington
        AM-3086
        SCI Somerset
        1600 Walters Mill Rd
        Somerset, PA  15510

        Counsel for Defendants
        (Via CM/ECF electronic mail)