```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3        HENRY UNSELD WASHINGTON,

 4                   Plaintiff,
            vs.                              Civil No. 15-1031
 5
          J.M. SMITH, T.S. OSWALD,
 6        D. FARRIER, AND M. STUMP.

 7                   Defendants.
                                        -  -  -
 8

 9      Transcript of Jury Trial Excerpts of Opening Statements,
        Henry Unseld Washington and Judgment of Acquittal Motion on
10      June 12, 2023, in the United States District Court, Pittsburgh,
        Pennsylvania, before The Honorable Cathy Bissoon, District
11      Judge.

12

13        APPEARANCES:

14        For the Plaintiff:     Pro Se

15        For the Defendants:    Scott A. Bradley, Esquire
                                 Amelia Jean Goodrich, Esquire
16                               Pennsylvania Office of Attorney General
                                 Civil Litigation
17                               1251 Waterfront Place
                                 Suite Mezzanine Level
18                               Pittsburgh, PA 15222

19        Court Reporter:        Sharon Siatkowski, RMR, CRR, CBC, CRI
                                 700 Grant Street, Suite 5300
20                               Pittsburgh, Pennsylvania 15219
                                 412.773.3623
21

22

23

24      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.
25
```

I N D E X

Proceeding                                                      Page

OPENING STATEMENT
    By Mr. Washington                                            4
    By Mr. Bradley                                               4

WITNESS:

HENRY UNSELD WASHINGTON
    Direct Examination by Mr. Washington                        12
    Cross-Examination by Mr. Bradley                            19
    Redirect Examination by Mr. Washington                      41

JUDGMENT OF ACQUITTAL MOTION                                    43
    By Mr. Bradley

JUDGEMENT OF ACQUITTAL RULING                                   44
    By Judge Bissoon

```
 1                     P R O C E E D I N G S
 2                           - - -
 3                  (In open court, 2:23 p.m.)
 4           THE COURT:  All right.  As we discussed previously,
 5   we'll be doing opening statements from your desk right in front
 6   of you.
 7           Will you be doing the opening statements, Mr. Bradley?
 8           MR. BRADLEY:  Yes, Your Honor.
 9           THE COURT:  I think we're ready.  Are you ready,
10   Mr. Washington?
11           MR. WASHINGTON:  I guess so.
12           MR. BRADLEY:  Your Honor.
13           THE COURT:  All right.
14           MR. BRADLEY:  Excuse me.
15           THE COURT:  Yes.
16           MR. BRADLEY:  Are we able to move the podium?  It's
17   sort of in the line of sight.
18           THE COURT:  Yeah.  Just roll it over to the corner.
19   Maybe even in this corner over here, Jamille, if you can do
20   that.  It might be -- it might be plugged.  Just make sure it's
21   not plugged.
22           THE COURT:  Okay.  You can get the jury.
23       (Pause.)
24       (Jury panel enters.)
25           THE COURT:  Please be seated.  I think I neglected to
```

 1   mention to Jurors Number 9, 10, and 11 that you are now Jurors

 2   Number 5, 6, 7, 8.  All right.  Very good.

 3             All right.  Mr. Washington, are you ready to start

 4   with your opening statement?

 5             MR. WASHINGTON:  I guess so.

 6             THE COURT:  Just speak directly into that microphone

 7   in front of you so that everybody can hear you.

 8             MR. WASHINGTON:  What the evidence will show here is

 9   that I was sexually assaulted and the motive was not penological

10   interest.  It was tended to be more humiliation or either some

11   type of sexual gratification.  Looking to humiliate me more than

12   anything else.

13             And these were not routine duties.  This was not a

14   part of their duty.  This was not a part of the officers' duty.

15   Uh-huh.

16             This occurred on three different dates but it was more

17   than three acts, that's what I wanted to correct.

18             THE COURT:  Okay.  Thank you, Mr. Washington.

19   Mr. Bradley.

20             MR. BRADLEY:  May it please the Court.

21   Mr. Washington.  Ladies and gentlemen of the jury.  The saying

22   goes, there are two sides to every story.  This is our first

23   opportunity to tell you the other side of the story in this

24   case.

25             Good afternoon.  Although we met earlier today, let me

1    formally introduce myself and Ms. Goodrich.  My name is Scott

2    Bradley.  I'm a deputy attorney general with the Pennsylvania

3    Office of Attorney General.  And, again, with me is Deputy

4    Attorney General Amy Goodrich.  It is our honor and privilege to

5    represent the Defendants in this case:  Corrections Officers

6    Timothy Oswald, Justin Smith, David Farrier, and Michael Stump.

7    We will be representing these individuals and advocating on

8    their behalf in this matter.

9           I wanted to take this opportunity to introduce

10   ourselves and the officers we represent in this case.  As Judge

11   Bissoon just explained before lunch, because Mr. Washington

12   bears the burden of proof in this case, he will present his case

13   first.  So this is our chance to provide you, the jury, with a

14   preview of the case we intend to present.

15          However, before I begin, there are two points I want

16   to emphasize as you hear the evidence in this case.  First, in

17   the field of corrections, officers and guards are permitted

18   under the law to, in certain circumstances, place their hands on

19   the inmates in their custody and control.  It can be for

20   purposes of conducting a search, for maintaining control over

21   the inmate during an escort from one place to another, and even

22   for using physical force to maintain order and discipline within

23   the prison.

24          The limits of this entitlement is established by the

25   Eighth Amendment.  Now, most of you have probably heard the

1  phrase "cruel and unusual punishment."  This comes from the

2  Eighth Amendment, and it prohibits force or conduct beyond that

3  which is reasonably required and a good faith effort to maintain

4  or restore discipline or, as Judge Bissoon explained before

5  lunch, for a legitimate, law enforcement, or penological

6  purpose.

7       With regard to claims of sexual abuse or harassment,

8  our courts have held that sexual assault meets the standard of

9  impermissible punishment under the Eighth Amendment because

10  sexual assault cannot and does not serve legitimate governmental

11  objectives, which leads to the second and perhaps more important

12  point.

13       Although prisoners do forfeit certain rights upon

14  incarceration, they do not forfeit basic human rights, including

15  the right to be free from sexual abuse or sexual assault by the

16  guards.  So we're not here to tell you that to sexually harass

17  or sexually abuse an inmate would not violate the constitution

18  of the Eighth Amendment.  Of course, it would.  And each of

19  these officers will testify from that stand that it would.

20  However, what they will also tell you is that they unequivocally

21  did not sexually abuse or sexually assault Mr. Washington, as he

22  claims.

23       The opening statements should tell the story of the

24  case.  They say that the essential elements of the story are the

25  so-called five Ws:  who, what, where, when, and why.  Using

1    these questions as a guide, this is the Defendants' case.  And

2    we'll start with the easy questions:  who, where, and when.

3            Obviously, we have the Plaintiff, Mr. Washington, and

4    you have heard briefly from him regarding his allegations.

5    There are four Defendants in this case related to three separate

6    incidents put forth by Mr. Washington.

7            At the time in question, all four officers were

8    employed by the Pennsylvania Department of Corrections and

9    except for Michael Stump, all of them still are.  All four were

10   working as corrections officers at the State Correctional

11   Institution at Greene.

12           Now, in the course of this trial, you're going to hear

13   some acronyms and abbreviations, such as SCI for State

14   Correctional Institution, DOC for Department of Corrections, CO

15   for corrections officers.  We'll try our best to identify those

16   acronyms as the testimony goes forward.

17           You will hear testimony from the witness stand from

18   each of the officers regarding their respective interactions

19   with Mr. Washington, and each will tell you about their service

20   with the Department of Corrections, they'll tell you about the

21   education, the training they received over the years to enable

22   them to perform the duties and responsibilities required of them

23   as corrections officers.

24           When did it happen?  Plaintiff has identified three

25   separate incidents occurring on August 1, 2013; April 2, 2015;

1    and July 14, 2015.

2              Where did it happen?  At the relevant time,

3    Mr. Washington was confined at the State Correctional

4    Institution at Greene, or SCI-Greene, which is located in

5    Waynesburg, down in Greene County, about an hour south if you're

6    on I-79.

7              I'm going to combine the last two, what and why,

8    because essentially that's what you're here to decide.  As you

9    have heard, Mr. Washington alleges that on each of these dates,

10   August 1, 2013, April 2nd and July 14th of 2015, his Eighth

11   Amendment rights were violated when these officers sexually

12   abused and sexually assaulted him.  This is the part of the

13   story you'll have to eventually decide.  You'll have to

14   determine whether Mr. Washington was subjected to sexual

15   harassment or sexual assault by Officers Oswald and Smith on

16   August 1st, by Officer Oswald on April 2nd, and by Officers

17   Farrier and Stump on July 14th.  However, each of these officers

18   will again take the witness stand and categorically deny that

19   they sexually harassed or sexually assaulted Mr. Washington on

20   any occasion.

21             Now, one of the most basic common, fundamental,

22   repetitive jobs of a corrections officer is escorting an inmate

23   from one place to another within the institution.  It is my

24   understanding that Mr. Washington claims that each of these

25   incidents occurred in the course of an escort from one place to

1    another.

2            I mentioned this because, over the years of their

3    careers, these officers have engaged in hundreds, if not

4    thousands, of inmate escorts from one place to another.  One

5    thing I can tell you is that these do not occur in a vacuum;

6    they take place from one part of the prison to another.  There

7    is never a time when during these escorts the officers and

8    inmates will be alone with the inmate.

9            As I said, this is the part of the story that will

10   ultimately be up to you, the jury, to determine.  As you heard

11   from Mr. Washington, he alleges that he was sexually harassed

12   and abused by these officers on the dates identified.  You must

13   decide whether these officers caused a violation of

14   Mr. Washington's rights under the Eighth Amendment.

15           Ladies and gentlemen, your service in this case

16   exemplifies the need for juries in the American civil justice

17   system.  This isn't a whodunit or some other mystery.  We know

18   who is involved and we know what each side claims.  However, as

19   I have said, this is a story with two different sides.  Your

20   task is to determine which side is telling the truth.  Indeed,

21   on the critical issues where there is disagreement, you will be

22   called upon to resolve the conflicts and testimony in rendering

23   a verdict.  This is the classical function of juries in our

24   system, to determine the facts of the case by evaluating and

25   determining the credibility of witnesses.  We will address this

 1   in more detail in our closing.

 2          At this point, I just wanted to stress the importance

 3   of your service in this case.  Not just to the parties who have

 4   a personal stake in the outcome of this case but also, in a

 5   larger sense, to the historical traditions of the American jury

 6   system.

 7          Finally, although I have briefly outlined the defense

 8   position for you, because of the trial process, because

 9   Mr. Washington bears the burden, you will hear from him first

10   before you hear our side of the story.  I know you'll keep an

11   open mind and wait until you hear both sides of this story

12   before coming to a judgment in this case.

13          I thank you for your attention to this point.  And I

14   am assured that each of you will fulfill your oaths as jurors to

15   fairly hear and try this case.  Thank you.

16          THE COURT:  Okay.  Thank you, Mr. Bradley.  Before we

17   start testimony, we are going to take a little bit of a break

18   just to get situated.  So I'm going to ask the jurors to convene

19   in the jury room briefly and we will invite you back out

20   momentarily.

21          All rise for the jury.

22      (Jury exits courtroom.)

23          THE COURT:  Mr. Washington, if you're going to be the

24   witness, I'd like to get you up in the witness box.

25          And you can feel free to move a chair there if you all

1   need to be close by.

2          MR. WASHINGTON:  Now?

3          THE COURT:  If that's how you're going to proceed.

4   You're going to be witness, the first witness, the only witness?

5          MR. WASHINGTON:  I'm the only witness I got.

6          THE COURT:  All right.  Well then, it will be you.

7          Have you decided whether you're going to proceed by

8   asking yourself questions, or are you just going to speak about

9   what happened?

10         MR. WASHINGTON:  I'm going to try and tell as best I

11  can what happened.

12         THE COURT:  Very good.  Okay.

13         Jamille, we'll just swear him in seated.

14         MR. WASHINGTON:  I don't want to hit these buttons by

15  mistake here.

16         THE COURT:  You don't want to do that.  That's not

17  going to be any good.  Move it up and down.

18         When I say "all rise," Mr. Washington, you need not

19  rise, okay, unless you want to, stay seated so they don't see

20  you in shackles.

21         MR. WASHINGTON:  I better get up now.

22         THE COURT:  Okay.

23     (Jury enters courtroom.)

24         THE COURT:  Jamille, if you can swear in

25  Mr. Washington.

 1            THE DEPUTY CLERK:  You may have a seat, sir.  Would

 2  you please raise your right hand.

 3            (Administration of the oath.)

 4            THE CLERK:  Thank you, sir.  You can put your hand

 5  down.  Can you please state and spell your name for the record,

 6  sir?

 7            MR. WASHINGTON:  My name is Henry Unseld Washington.

 8            THE COURT:  Okay.  And just so the jury's aware,

 9  Mr. Washington will be his first witness here today.  And so

10  we'll turn the floor over to him.

11            HENRY UNSELD WASHINGTON, the Plaintiff herein, having

12  been first duly sworn, testified in the narrative as follows:

13                      DIRECT EXAMINATION

14            THE WITNESS:  Well, I would like to say that during

15  the course of being housed at SCI-Greene RHU, which is the

16  restricted housing unit, the first incident happened.  I'm using

17  the toilet, and two officers come to my door in the midst of me

18  using the toilet and ordered me to remove myself from the toilet

19  because I had a legal visit.

20            Now, I wasn't allowed to clean my rear end.  I was

21  told to get immediately up or else my visit would be canceled.

22  This is a legal visit.  And I was told to expose my rear end

23  without having cleaned myself and all and put on my jumpsuit.

24            Now, once I got outside the cell, one of the officers

25  started to rub and touch me in a very sexual manner.  And

there's something they call a tether that was hooked to my
handcuffs.  I was being escorted to the visiting room.  Not only
this touching -- and I'm not talking about just my arms or
placing your hand on me -- this was rubbing and touching my back
and placing your hands on my rear end.

And at the same time, I -- it appeared that these were
needles or either a pin or some type of object that every time I
tried to move, I'd get stuck with this object.  Now, usually
these officers carried nightsticks or what you would call a riot
stick.  They keep shoving me along with the stick, and it's not
just my arm or anything; all of it tended to be on my rear end,
trying to insert it into my rectum.  And if I tried to move, I
was jerked with the tether or poked with a pin.  I said it was a
pin but it was a sharp object.  I don't know which it was.

And once I got to the visiting room, when I stepped
inside the booth, someone taken -- insert their finger into the
cleavage of my buttocks.  And so I jumped, and they snatched the
tether back.  Once they closed the door to the visiting room
door, someone took the tether -- and the person I believe was
doing this was Mr. Oswald -- he pulls it so tight that it caused
my arms to come through the wicket.

The other gentleman with him, which was a sergeant,
has a stick and started to prod me like I was an animal.  And
they did it so vigorously that it was pretty much -- it touched
my testicles.

1          And I don't know if all of you are aware, but a tender

2   spot on most men is their testicles.  And it pretty much made me

3   so weak that I went to the floor and could not get up.

4          They opened the door to the visiting room to take the

5   handcuffs and tethers off, and I still couldn't get up on the

6   seat for more than, I would say, at least 20 minutes.

7          And on the way back, some of the same things happened:

8   the sticking me and prodding me and acting as though I'm some

9   type of prostitute, calling me names, and specifically would

10  infer to a black person.  And I'm not talking about a racial

11  slur.  I mean honey and sugar and this type of -- blackberry

12  and, you know, that type of stuff.

13         And this went on -- I'd say I got stuck more than four

14  times on the way to and probably about ten times on the way

15  back.  And according to them, they were punishing me for a lot

16  of stuff that I had said to people, like Mother Teresa and to a

17  lot of elected officials around the country because I was -- the

18  way I was being treated --

19         MR. BRADLEY:  Your Honor, I object.  This goes beyond

20  the scope.

21         THE COURT:  Yes.  If you can stick to the allegations

22  in the case.  It's about what happened to you, not what you

23  believe the motivation was.

24         THE WITNESS:  Well, all right.  I did -- all of this,

25  I'm saying, is in the complaint.  All of it.

1          THE COURT:  Okay.  No one will have your complaint, so
2    you need to testify.

3          THE WITNESS:  All right.  You know, they took my
4    paperwork away from me.  But it was in the complaint.

5          Listen, according to them -- I didn't make it up.
6    According to them, they were penalizing me for doing that.

7          And when I got back to my cell, I could sense blood
8    running down the back of my leg.  And my crotch was all soaked
9    with blood.  So I wanted to see medical but they wouldn't allow
10   me to see them.  And I hit the emergency button, but nobody ever
11   responded.  So it appears that they had put my emergency button
12   on mute.

13         This was such a humiliating thing for me that I pretty
14   much lost my mind there.  I mean, even today I'm affected by
15   this.  I pretty much go through psychological changes.  Even
16   today I don't like for people to touch me or embrace me or stand
17   near me because it appears I may be going by the same thing.
18   And it's not uncommon for me to -- to envision that this is
19   happening to me over and over and over again.

20         Now, to say this is three different incidents is an
21   understatement.  This is several events that happened in one
22   day.

23         Now, the next one was -- and let me make it clear,
24   these are not officers that was working the pod that I was on.
25   They came from another pod to do this escorting.  And it

1   appeared that I was targeted by them because they didn't work
2   this pod, although they were familiar with me.

3         Now, the next -- the next allegation I'd like to make
4   is, once again, a sergeant.  One of the guys that was in the
5   first event had became a sergeant.  The sergeants don't usually
6   do showers.  This is during showers that all of a sudden he
7   appears.  And he wasn't assigned to the block.  How did he get
8   over there?  I don't know.  But he come to get me from the
9   shower and right away he starts.  And I'm saying, "Don't touch
10  me."

11        He's touching me and all up and down my back and
12  across my rump and all up on me, making sounds like a lady.
13  Calling me his blackberry and sweet dark sugar and all this
14  stuff.  Making noise.

15        And escorting me to my cell, I'm trying to get away
16  from him because the last thing you want is someone to see you
17  being treated like if somebody's having sex with you.  So by the
18  time I get to my cell, for, like, maybe the third time, he takes
19  a full hand on my rump in the palm of his hand.  So I'm jumping
20  because I'm trying to keep away from him.  They got a tether
21  they hold to you where you can't go so -- so far.  So he's
22  saying, "Oh, it's soft as cotton," talking about rubbing my rear
23  end and squeezing my rear end.

24        And as I get inside the door, he takes and shoves his
25  finger into my buttocks.  You know, as if he's trying to insert

1  his finger into my rectum.  So he's going to spray me if I run

2  to the back of the cell.  Plus, he has a tether on me.

3          So when I go to get out -- put my hand through the

4  wicket to get them -- for the handcuffs off, he starts again.

5  He ain't trying to get the handcuffs off.  He wants to poke me

6  in the rectum.

7          So that's pretty much the way that that second event

8  happened.  And that was one of the guys that was involved in the

9  first event.  He had became a sergeant then.

10          Now, as you can see, those -- that's more than one act

11  that occurred there in that second date there.

12          Now, I was about to leave.  I hadn't seen these people

13  in, I'd say, a few months.  I don't know exactly but it was more

14  than a few months.  Guys come to my cell.  It might have been,

15  like, 4:30 in the morning.  I'm being transferred to another

16  prison.  They going to fix me.  They going to give me something

17  to leave with.  Take this with you.

18          They start touching me.  And every stop we make, they

19  stand up against me making their -- you know, their penis rub up

20  against my leg and my thighs.  I don't want that to happen, so

21  I'm trying to get away from them.  But there's only so much you

22  can do.  And you don't want to get sprayed or beat up with

23  sticks.

24          And this happened.  And I think we may have at least

25  four stops, if not six stops.  And so the same thing kept

1  happening.  They wanted to touch me.  And so with my hands

2  behind my back, they want to stand up so close that my hands are

3  going to touch their penis.  So I don't want that to happen.

4       And it ain't just -- these were not coincidences.  And

5  these are not the routines that any officer is taught to do for

6  the role of an officer.  And these are not stuff that every

7  inmate go through.  According to these individuals, and they did

8  this more than once, this were to teach me a lesson.  This was

9  something to take with me.

10      When we got to the R&D, you had to wait until they

11 opened the doors.  There they go again, up against me.  And they

12 going so hard that they squirted something on my hand.  When I

13 say "squirted something on my hand," I'm talking about semen.

14 And once I got inside, and I'm doing all I can to keep from

15 breaking down crying at the time, I took what I could and

16 cleaned my hands and put it on my sock.

17      I had this sock in my property up until July of just

18 past.  I don't know where my property is now and I don't know if

19 the sock is still in there.  I kept complaining, complaining

20 trying to get it, but nobody would give me my property.

21      Now, that's -- that's the situation there.  I don't

22 know how to explain it to you any different.  But believe me, I

23 spoke to psychiatrists, psychologists, and everything about it.

24 And the way they're talking, I'm going to be going through it --

25 that's never going to leave my mind.  It's not going to leave my

1    mind.

2              I'm not proud to say it, but yes, I was treated very

3    bad and humiliated.  It's terrible.

4              THE COURT:  Okay.  Is that all, Mr. Washington?

5              THE WITNESS:  I don't know much else to say, Miss.

6              THE COURT:  Okay.  All right.  Any cross-examination?

7              MR. BRADLEY:  Yes, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. BRADLEY:

10        Q.   Good afternoon, Mr. Washington.  In the first

11   incident, which has been identified as August 1, 2013, what

12   housing unit were you in?

13        A.   I believe it was -- the housing unit, you speaking of

14   block, right?  This is the RHU.

15        Q.   I'm sorry.  What was the designation of the block?

16        A.   I believe this was G block.

17        Q.   And you indicated that when you were in G block you

18   wore a jumpsuit?

19        A.   Yeah.  They -- they make everybody wear jumpsuits.

20        Q.   And is that a one-piece piece of clothing?

21        A.   Yeah.  You -- it's all made of one piece.  You have to

22   step in and then button it up.

23        Q.   And you said you were going for a legal visit that

24   day.  Where was the legal visit?  Within the institution, where

25   was the legal visit?

1      A.    It was part of RHU.  They got their own little special

2   area where they go for the legal visits.

3      Q.    Did you have to leave G block itself to get to the

4   visiting area?

5      A.    I would say so.  I wouldn't envision that to be

6   G block.  And plus, this has been more than a couple of days

7   ago.  So I don't remember exactly where it was.

8      Q.    Do you recall having to leave G block, though?

9      A.    Well, yeah.  You -- they don't give you the visit

10   right there at your door.  So yes.

11      Q.    And I apologize.  I have to make a record.  So some of

12   these questions may seem simple or obvious.  But I'm just asking

13   to create the record.

14           So do you recall what time of day this was?

15      A.    I do not.  But I can tell you that I -- from

16   remembering, they don't start visiting until 8:00.  And I think

17   they only last them until 4:00 or 3:30 or something like -- I

18   think that's between those times.

19      Q.    On the housing units, do you understand that the

20   officers that work there work in shifts?

21      A.    Do -- officers, yeah.  I think they got three shifts.

22      Q.    Do you know what the times of those shifts are?

23      A.    I believe this is the same way across the state:  6:00

24   to 2:00 and 2:00 to 10:00 and 10:00 to 6:00.

25      Q.    And that would be 6:00 a.m. to 2:00 p.m.?

1    A.    Oh, I believe there's -- yes.

2    Q.    And then 2:00 p.m. to 10:00 p.m.?

3    A.    Yes.

4    Q.    And then 10:00 p.m. to 6:00 a.m.?

5    A.    I believe that's the way it works.

6    Q.    Do you recall on this first incident on what shift it

7  occurred?

8    A.    If I had to say, I would say it was the first shift.

9    Q.    And that would be the 6:00 to 2:00 shift?

10    A.    Yes.  I believe that's the shift it was on.

11    Q.    And do you recall back in 2013 how many corrections

12  officers worked on the 6:00 to 2:00 shift in G block?

13    A.    I -- I never took record of that.  No, I haven't.

14    Q.    Is it fair to say there were more than two?

15    A.    I'm pretty sure there was more than two people.

16    Q.    And do you recall how many inmates were housed in

17  G block on that day in 2013?

18    A.    No, I don't remember.  But I wasn't the only one on

19  the block.

20    Q.    And I believe your testimony was that as soon as you

21  came outside your cell, these two officers started to rub and

22  touch you outside your cell; is that correct?

23    A.    That is very correct.

24    Q.    Now from what I understand, you've testified to they

25  take you from G block over to the building with the visiting

1    room; is that correct?

2        A.    Yes.  Yes.

3        Q.    Do you recall how you went -- once you leave G block,

4    are you outside in the open air?

5        A.    No.  I don't remember going outside of -- of a

6    building.  I don't remember that.

7        Q.    Are there hallways and tunnels from one --

8        A.    I'm pretty sure there was hallways.

9        Q.    Do you recall passing anyone as the officers were

10   escorting you?

11       A.    No.  All these acts were done out of camera, out of

12   sight of camera.  And I don't remember anyone near us.

13       Q.    Now, as I understand it, when you get to the visiting

14   room, there is a door.

15            And you've mentioned a wicket.  Can you tell the jury

16   what a wicket is?

17       A.    I'll do what I can to describe it.  It's usually a

18   hole cut in the door to either -- to both handcuff and

19   unhandcuff people.  And they usually use that slot to feed

20   people when they got the door closed.

21       Q.    So it's an opening inside a door through which they

22   can either place handcuffs on, remove handcuffs, pass food in,

23   if it's a cell, that type of thing?

24       A.    Yes.

25       Q.    And was there a wicket in the door for the visiting

1  area?

2      A.  Oh, yes.

3      Q.  And as I understand it, there's -- the visiting room

4  consists of two parts with a plastic screen in between two

5  parts; is that correct?

6      A.  Oh, you mean as far as between the visitor and the --

7  and the inmate?

8      Q.  Yes.

9      A.  Yeah.  There's some type of dividing, maybe plexiglass

10  or something like that.

11      Q.  And you're put in the one side, and then your visitor

12  is put on the other side; is that correct?

13      A.  Yes.

14      Q.  So did anything happen before you were placed in your

15  part of the visiting room?  Just outside the visiting room door,

16  was any of this conduct going on at that time?

17      A.  Yes.  And -- and as I stepped inside, some more.  They

18  was -- as I got ready to stick my hand through the wicket there,

19  they pulled -- pulled me through there, pretty much.

20      Q.  Is your testimony there was just the two officers that

21  were escorting you.  Is that correct?

22      A.  Yes.

23      Q.  Nobody else was involved?

24      A.  If they were, I didn't realize it.

25      Q.  Did both of them have the nightsticks you were

1  referring to?

2      A.   Both had nightsticks.  And they also had a pen or a

3  needle.  I'm not really sure what it was.

4      Q.   And were at times -- did you feel both nightsticks at

5  the same time?

6      A.   It's hard to say.  But I know they kept shoving me

7  along and shoving me in my buttocks with it.  It's hard for me

8  to say if they both touched me at the same time.

9      Q.   You indicated that when you returned to your cell, you

10  noted that you were bleeding?

11      A.   Yes.

12      Q.   And you indicated that they wouldn't allow you to go

13  to medical; is that correct?

14      A.   Nobody.  That's right.

15      Q.   When you talk about them pushing the nightstick into

16  your buttocks, was it against your bare skin, or was it through

17  the jumpsuit?

18      A.   Well, it was -- I had my jumpsuit on, sir.

19      Q.   So they never made physical contact with your skin?

20      A.   I would say that's an incorrect assessment there.  If

21  you stick or are pushing a stick through a guy's jumpsuit, of

22  course you going to make contact with their skin.

23      Q.   Are you saying the nightstick was directly against

24  your skin, or the jumpsuit was in between?

25      A.   They were -- I had my jumpsuit on, sir.  So it had to

1    be the nightstick.

2        Q.    And your testimony today is that that caused bleeding

3    from your rectum?

4        A.    I was bleeding because they're sticking me with, I'm

5    not sure if it's needles or a pin.  And by prying me with the

6    nightstick caused me to be bleeding from my penis because they

7    did something to my testicles.

8        Q.    Mr. Washington, do you recall giving a prior

9    deposition in this matter?

10       A.    I know that someone came to -- to ask me about that.

11   And if that's what you're speaking of, a deposition, yes.

12       Q.    I believe that took place on May 3, 2018, at SCI-

13   Somerset?

14       A.    I don't know the date, sir.

15       Q.    And there was an attorney from the attorney general's

16   office present.  Do you recall that?

17       A.    I don't know who these people were, sir.

18       Q.    But they asked you questions about your case; is that

19   correct?

20       A.    From -- they were questioning me about a lot of

21   things.

22       Q.    And did you answer truthfully to those questions?

23       A.    I did it the best I could.

24       Q.    Now, the second incident, is that -- you talked about

25   the showers.  Were you being taken to the showers or from the

1   showers?

2       A.   I was -- I was being taken out of the shower, sir.

3       Q.   Okay.  And just so the jury understands -- well, let's

4   start back.  What housing unit were you in for the second

5   incident?

6       A.   I was on G.  G unit.

7       Q.   And the cells in G unit, there's no shower in the

8   cell; is that correct?

9       A.   Everyone takes a shower in one designated spot.  It's

10  not in his cell.

11      Q.   Okay.  And I believe it was your testimony that as you

12  were brought back and placed into your cell, that the officer

13  was going to remove your handcuffs.  But he kept poking you from

14  behind with his hands; is that correct?

15      A.   There's something that happened prior to that, but

16  that did happen.

17      Q.   And at that point, you were in the cell; is that

18  correct?

19      A.   I had stepped inside the cell.

20      Q.   And did he close the door?

21      A.   Not -- not prior to sticking his finger in my

22  buttocks.

23      Q.   So he didn't do that through the wicket.  He did that

24  through the open door?

25      A.   No.  He did it more than once.  When he got ready to

1   take my handcuffs off, he did it again.  And there's a few

2   things that happened before that.

3       Q.   I'm just trying to understand that point where he's

4   returned you to the cell.

5            Are you saying that before he closed the door, he was

6   reaching in and inserting his finger into your rectum?

7       A.   When I got -- when I got to the cell, the door's open.

8   When I stepped inside, he poked me.  All right.  I jumped and I

9   started to move away, but you know you can't go but so far when

10  they got that tether on you.  And plus, I don't want to get

11  sprayed and beat up with sticks.  Now, that part happened before

12  he closed the door.

13      Q.   Okay.  Now he's closed the door.  And he's going to

14  remove the handcuffs; is that correct?

15      A.   Yes.  When I stuck my hand through to get my -- the

16  handcuffs off, he poked me again.

17      Q.   So at that point, did he reach in through the wicket

18  into your cell through the closed door?

19      A.   Yes.  But this isn't -- it applied -- it sounded

20  though you implying this is a long ways.  This is right up

21  against the door.

22      Q.   Now, I'm just trying to be clear on what your claim

23  is.  And your claim is that he reached in through the wicket and

24  attempted, or did, insert his finger into your rectum?

25      A.   Oh, he did that, yes.

```
 1        Q.   And then I believe you just said he did it again after
 2   he removed the handcuffs?
 3        A.   Well, that is -- I thought that's what you was asking
 4   there in the last question.  Yes, he did it.
 5        Q.   So where were your hands after they removed the
 6   handcuffs?
 7        A.   Well, after he removed the handcuffs, I went over to
 8   the -- I got out of the way.  I moved away.  I'm humiliated.  I
 9   pretty much -- hey, it did me in.  I needed to see the psych.
10        Q.   The last incident, you indicated that you were being
11   transferred from SCI-Greene?
12        A.   Yes.
13        Q.   And at that point, what housing unit were you in at
14   SCI-Greene?
15        A.   I was on G.
16        Q.   Still on G block.
17             And the officers that you claim assaulted you, are
18   they the ones that brought you out of your cell that morning?
19        A.   The people -- yes.  Those are the people that come to
20   my door.
21        Q.   And so these officers came to your cell in G block,
22   placed you in handcuffs, and took you from there to, I believe
23   you mentioned R&D?
24        A.   Yes.
25        Q.   And what is R&D?
```

1    A.    I believe R&D would mean those are receiving and

2  delivering or receiving and departure.  I'm not positive which

3  one it means.

4    Q.    Now, again, this is one of those questions that I'm

5  just trying to build the record and help the jury understand the

6  situation because they've never been to SCI-Greene.

7         How far is R&D from SCI-Greene?

8    A.    That's all the -- that's all the same prison.

9    Q.    I understand that.  But I mean, G block is in one part

10  of the prison.  Is R&D right next door, or do you have to go

11  some distance to get to R&D?

12    A.    G block is part of the RHU.  And R&D, I would say if

13  you're going a straight route, it would probably take you five

14  minutes.  But if you waiting for doors and stuff like that, it

15  can take maybe 20.

16    Q.    And you mentioned the doors.  I assume that within a

17  prison, as you go from one door to the next, it's locked and you

18  have to wait for someone to open it?

19    A.    From what I remember, they had sliding doors.  But

20  either way, you've got to wait for somebody to open them.

21    Q.    Are those the four to six stops you were talking about

22  in your testimony, that on each of the four to six stops that

23  they would abuse you?

24    A.    Abuse is an understatement.  Yes.

25    Q.    And is it your testimony that at this point the

1  officer -- at least one of the officers exposed his penis and

2  either placed it against your hands or against your body?

3      A.   Yes.

4      Q.   And he did so to the point that he squirted semen on

5  your hands?

6      A.   He sure did.

7      Q.   And at what point in the escort from G block to R&D

8  did this occur?

9      A.   We were waiting for the doors to open at R&D.

10     Q.   So this was the final stop?

11     A.   Yeah.

12     Q.   Once you got to R&D, were there other inmates being

13  transferred that morning?

14     A.   There probably were, but there was none standing there

15  by where we were.

16     Q.   Well, how many doors are there to R&D?

17     A.   I'm talking from memory here.  But you had to wait for

18  one door to open and then you step inside and there's another

19  door.

20     Q.   Well, which door were you in front of when this

21  occurred?  I thought you said it was the last door before R&D.

22     A.   We were still outside on -- we was outside R&D by

23  then.

24     Q.   Were you outside the first door to R&D or the second

25  door to R&D?

1     A.   We were outside the whole building, which is the first

2 door.

3     Q.   Do you know what I mean by the term "white shirt"?

4     A.   Penitentiary language, I believe that means a

5 lieutenant or a captain.

6     Q.   It's sometimes called "white hats"?

7     A.   Those are both penitentiary terms.

8     Q.   Were there any lieutenants or captains in R&D when you

9 went in?

10     A.   Usually they come with the group, but they don't

11 follow every inmate everywhere.

12     Q.   Once you get to R&D, are there lieutenants or captains

13 there?

14     A.   I don't remember them being there.

15     Q.   Were there other corrections officers there?

16     A.   They were the ones that opened the door for us to --

17 to get in.  I believe they're -- I don't think you can -- some

18 of the doors at midnight are operated by guards over in the

19 medical department.  I believe I'm remembering that's the way it

20 is.  This was, like, prior to 5:00.

21     Q.   5:00 in the morning?

22     A.   Yes.

23     Q.   So this would have been the 10:00 to 6:00 shift?

24     A.   Yes.

25     Q.   10:00 p.m. to 6:00 a.m.

1         Do you know if there were cameras on the doors so that

2    somebody that's in charge of opening the doors can see if

3    there's people waiting to go through the doors?

4         A.    There are supposed to be.  But usually, if the inmate

5    is saying something and it's on camera, they won't -- they say

6    the camera wasn't working.

7         I asked for films of this and they claim no film on

8    it.

9         Q.    But you understand, there are cameras there that are

10   recording -- maybe not recording is the right word.  But there

11   are cameras that have that view so somebody can see if

12   somebody's waiting to go through that door?

13        A.    That's misleading.  There are cameras that have the

14   capability of doing that.  But if the inmate got something that

15   actually happened, that they going to say the camera wasn't

16   working.

17        Q.    Okay.  But as far as you know, the camera was working;

18   right?

19        A.    No, I don't know if the camera was working.

20        Q.    Prior to going to SCI-Somerset, did you go to the

21   medical department at SCI-Greene in preparation for your

22   transfer?

23        A.    I don't remember going to no medical department.

24        Q.    How about when you got to SCI-Somerset, did you go to

25   the medical department there?

1      A.    Once you get to the SCI -- once you get to any prison

2   on transfer, they want to know do you have any chronic ailments

3   and stuff like that.

4      Q.    So once you got to SCI-Somerset, somebody from the

5   medical department spoke to you; is that correct?

6      A.    They do -- I think they do that with everybody.  Yeah.

7      Q.    And they asked you a bunch of questions?

8      A.    They want to know if you -- what kind of medication

9   you're taking and stuff like that.

10      Q.    And do you recall that happening when you went to

11   SCI-Somerset on July 14, 2015?

12      A.    Every -- they do that to everyone every time you being

13   transferred.  I believe that's what they do.

14      Q.    Okay.  Now I need you to -- I understand that's what

15   always happens.  I need to know if that's what happened on

16   July 14, 2015, when you went to SCI-Somerset.

17      A.    Listen.  I'm trying to explain it to you as best I

18   can.  As far as I know, they do that to everybody at every

19   transfer.

20      Q.    Did they do that to you on July 14, 2015?

21      A.    I heard you say that about two or three times already,

22   and I'm trying to tell you they do that to everybody --

23      Q.    But if they --

24      A.    -- every time.

25      Q.    I'll move on.

```
 1              MR. BRADLEY:  Your Honor, I need about five minutes to
 2   set up an exhibit.
 3              THE COURT:  Okay.  We'll take our afternoon break
 4   here.  We'll take about a ten-minute break here.
 5              All rise for the jury.
 6         (Jury exits courtroom.)
 7              THE COURT:  You can be seated.  We'll take ten
 8   minutes.
 9              Mr. Washington, if you'd like a ten-minute break as
10   well, feel free.
11              We'll stand in recess.
12              THE WITNESS:  Should I remain in the seat?
13              THE COURT:  If you need to take a break to go to the
14   bathroom, now would be a good time to do it.
15              THE MARSHAL:  Do you have to go to the bathroom?
16              THE WITNESS:  No, I don't.
17              THE COURT:  It's up to you, guys.  You can stay there
18   if you'd like.
19         (Whereupon, a recess was taken.)
20              THE COURT:  Do we have our exhibit?
21              MR. BRADLEY:  We do, Your Honor.  Unfortunately, the
22   Internet and computers are not cooperating.
23              THE COURT:  Okay.
24              MR. BRADLEY:  But I can use the ELMO.
25              THE COURT:  All right.  Very good.  And you're just
```

1   going to use the ELMO, is that what you're doing?

2           MR. BRADLEY:  Yes.  Your Honor, I'm going to present

3   prior testimony that we believe is inconsistent with his

4   testimony.  So at this point, this would not go to the jury.

5   This would just be on the witness display.

6           THE COURT:  Well, I mean, if you're doing it to

7   refresh his recollection, I would ask that you show it to him

8   first.

9           MR. BRADLEY:  Yes, of course.

10          THE COURT:  Before you publish it to the jury.

11          MR. BRADLEY:  Of course, yes.

12          THE COURT:  Okay.  Very good.  Okay.

13      (Jury enters courtroom.)

14          THE COURT:  You can be seated.  Everything okay back

15  in the jury room with you guys?  Do you have coffee and all

16  that?

17      (Jury nods affirmatively.)

18          THE COURT:  Great.  You can continue, Mr. Bradley.

19          MR. BRADLEY:  Thank you.  Your Honor, may I approach

20  the ELMO?

21          THE COURT:  Yes.

22  BY MR. BRADLEY:

23      Q.   Mr. Washington, we had talked before about the

24  deposition you gave at SCI-Somerset back in 2018.

25          Do you recall me asking you about a deposition you

```
 1    gave?

 2         A.    If you're speaking of a few minutes ago, yes.

 3         Q.    Yes.

 4               So I'm going to show you a couple of pages from that

 5    so you can look at it.  I want you to start at page 109.

 6               THE COURT:  If you can not publish it to the jury.  If

 7    you want to show it to him, you can approach him and show it to

 8    him.

 9               MR. BRADLEY:  I'm sorry.

10         (Document handed to the witness.)

11    BY MR. BRADLEY:

12         Q.    If you could read to yourself from pages 109

13    through 112.  And let me know when you're --

14         A.    Is there any particular part you want me to read?

15         Q.    From page 109 through page 112.  Just so you see

16    everything that's there.

17         (Witness reading document.)

18               THE COURT:  Have you read those pages now,

19    Mr. Washington?

20               THE WITNESS:  I didn't hear you.

21               THE COURT:  Did you finish reading those pages?

22               THE WITNESS:  Give me a few more seconds.

23               THE COURT:  Okay.

24         (Short pause.)

25               THE WITNESS:  Yes.  I'm done with them.
```

 1              THE COURT:   Okay.   Questions?

 2     BY MR. BRADLEY:

 3        Q.    Mr. Washington, you would agree this part of the

 4     deposition was asking about the incident on August 1, 2013;

 5     correct?

 6        A.    What I can agree to is what's read here.  I don't know

 7     if this is accurate or not.

 8        Q.    But if you look at page 109, it has the date

 9     August 1st; is that correct?

10        A.    I'm looking to see if it says that.  But it got

11     page 109.

12        Q.    On line 5.

13        A.    I don't -- yes.  It does say that, on that date on

14     August 1st, yes.

15        Q.    Okay.  And your testimony here today was that you

16     suffered bleeding as a result of the incident on August 1st;

17     correct?

18        A.    That's right.

19        Q.    And you were asked back at your deposition in 2018,

20     did you have bleeding as a result of this, referring to the

21     incident on August 1st.

22              What was your answer to that question back in 2018?

23        A.    What line are we seeing?

24        Q.    We're on page 111 now at line 18.

25        A.    Page 111.

1        Q.   Page 111, at lines 18 to 20.

2        A.   You're -- you're omitting something.  You are

3   saying did you -- you're asking me if it was my rectum bleeding.

4   And I think I made that in my testimony saying I wasn't bleeding

5   from the rectum.  I was bleeding from my penis and bleeding from

6   pin sticks on my buttocks.

7        Q.   You would agree with me that nowhere in that

8   deposition does that mention pin sticks or bleeding from the

9   penis or testicles or anything of that nature?

10       A.   No one asked me about that.  I agree with you, but no

11  one asked me about that.

12       Q.   Well, the question was, "Did you have bleeding as a

13  result of this?"  What was your response to that question?

14       A.   I -- let me go farther.  I'll try to be clear here.

15  It's asking me if I was bleeding from the rectum.  And I think,

16  in my testimony a few minutes ago, I even said I wasn't bleeding

17  from the rectum.

18       Q.   But you claim you are bleeding.  You were bleeding

19  that day?

20       A.   Bleeding from my penis and the pin sticks on my

21  buttocks.

22       Q.   And in these questions, nowhere do you say that you

23  were bleeding from your penis or your testicles?

24       A.   You make a good point.  But you are not referring

25  to -- nobody asked me that.

1    Q.   Well, as I read the question, "Did you have bleeding

2  as a result of this?"  It doesn't say rectum or penis or

3  anything else.  It says, "Do you have bleeding as a result of

4  this?"

5    A.   You make a good point.  I -- me and you in agreement

6  on that.  But they're not asking me did I have bleeding from my

7  penis or was my buttocks bleeding.  And earlier the thing was

8  did -- was your rectum bleeding.  And I made the testimony that

9  I wasn't bleeding from the rectum.

10           MR. BRADLEY:  Your Honor, may I publish the document?

11           THE COURT:  No.  I mean, if you have some specific

12  questions about it.  We don't typically publish that.  If you

13  have some questions, you can feel free to ask him.

14  BY MR. BRADLEY:

15    Q.   In the next question, it's asking you about in your

16  complaint, you didn't complain to medical about being poked in

17  the rectum, did you?

18    A.   I want to say it now if I didn't say it earlier.  They

19  wouldn't allow me to see medical.  They wouldn't allow that.

20    Q.   You're saying the COs wouldn't allow you to see

21  medical; correct?

22    A.   The people that pulled me in the cell wouldn't allow

23  me to see medical.  I pushed the emergency button.  Nobody would

24  answer.  It appears that that button was on mute because I kept

25  doing it.  And it pretty much -- I pretty much was zoned out.  I

1  was humiliated and was hurt psychologically.

2      Q.   Now, in your answer to that question on page 112 at

3  line 2 to line 5, you don't say anything about the COs not

4  letting you see medical, do you?

5      A.   There -- here's my answer.  The question is, medical,

6  being poked in the rectum, did you?  First, I want to say again,

7  I don't know if all of this is accurate.  But they way it's read

8  here, it doesn't ask did you -- this is not asking about what

9  happened in my cell at the RHU.

10         You got me -- I don't know if I said it.  But my

11  complaint -- but I did not -- I don't remember.

12         And medical, I'm telling you, don't come.  That's what

13  I was trying to infer to you.  I'm hitting the button there,

14  nobody come.  The button is on mute.  I asked to see medical.

15  Nobody would let me see medical.  They wouldn't allow it.

16     Q.   Well, in the answer you gave in 2018, you said medical

17  doesn't come, regardless of whether they're called.  And today

18  you're saying the COs didn't call.

19     A.   No, no.  You -- you saying that.  I didn't say that.

20  You saying that.

21         I -- I asked to see medical.  They wouldn't allow me

22  to see medical.  I hit the button to let the controls know that

23  I need to see medical.  They put it on mute.  And it's obvious

24  why they did it.  They wouldn't allow me to see medical.  They

25  never came.  I'm yelling for medical, they never come.  You

1    can't -- you can't stay on the door and just keep yelling.  Then
2    you get beat up.
3              MR. BRADLEY:  No further questions, Your Honor.
4              THE COURT:  Okay.  Now, Mr. Washington, is there
5    anything that you'd like to say in your own case that reverts
6    back to anything Mr. Bradley may have asked you?
7              THE WITNESS:  Yes.

8                        <u>REDIRECT EXAMINATION</u>

9              THE WITNESS:  I -- I don't have a copy of this.  This
10   is my first time seeing this.  And my stuff is -- is being
11   denied to me by the very same people that I got -- I'm suing.
12   And nowhere are we speaking of these -- these questions is
13   similar to what the answer would be.
14             Like, for instance, "Were you bleeding from the
15   rectum?"  Well, no, I wasn't bleeding from the rectum.  I said
16   that.  But these questions are, "Were you bleeding?"  That skips
17   a whole sentence there.
18             And no, they wouldn't let me see medical.  I don't
19   know if I'm explaining it clear here, but that's the best that I
20   can give you clearly.  They wouldn't allow me to see medical.
21   And I'm bleeding from my buttocks.  And I'm bleeding from my
22   penis from them prying against my testicles.
23             THE COURT:  Anything else, Mr. Washington?
24             THE WITNESS:  Not that I can think of, Miss.
25             THE COURT:  Okay.  Any recross, Mr. Bradley?

```
 1              MR. BRADLEY:  No, Your Honor.  Thank you.

 2              THE COURT:  Okay.  Well, ladies and gentlemen, we're

 3    very close to the 4:00 hour now.  It seems like this is probably

 4    a good time to break for the evening.

 5              Please remember all of my cautionary notes from

 6    before.  Please do not talk to anybody about this case.  If you

 7    go home and you have a significant other or family at home,

 8    please just tell them that I'm a very mean person and I'm not

 9    allowing you to speak about this case.  You can talk to them

10    until the cows come home once you're done with deliberations.

11    But until then, please do not talk to each other and please do

12    not talk to anyone else about the case.

13              Also again, I'll remind you, please do not try to

14    investigate anything on your own.  Do not try to do any research

15    on your own.  Again, everything you learn about this case

16    happens in this courtroom and this courtroom only.  Okay?

17              I'd like for you all to be here at 8:45 tomorrow if

18    that works for everybody.  Is that okay?  All right.  Excellent.

19    8:45 tomorrow.  Have a great night.

20              All rise for the jury.

21         (Jury exits courtroom.)

22              THE COURT:  All right.  Mr. Washington can step down.

23    Take a minute.

24              MR. WASHINGTON:  I'm going to leave this paper up

25    here.
```

 1          THE COURT:  Yeah.  They'll grab it from you.  They'll

 2  grab it from there.  Thank you.

 3       (Short pause.)

 4          THE COURT:  Everybody else can be seated.  Now, if I

 5  understood you correctly before, Mr. Washington, am I correct

 6  that you were the only witness that you intended to call?

 7          MR. WASHINGTON:  Yeah.  I wasn't -- I wasn't allowed

 8  to contact any other inmates to ask them did they see it.

 9          THE COURT:  Okay.  All right.  And so are you

10  suggesting then that you're resting your case with what you've

11  just presented?

12          MR. WASHINGTON:  I don't have anything else.  They

13  tell me they ain't got no film.

14          THE COURT:  All right.  I will entertain at this point

15  any motions from the Defendants.

16          Mr. BRADLEY:  Thank you, Your Honor.  We would move

17  for a judgment of acquittal of all Defendants, particularly

18  Farrier, Smith, and Stump.  There was nowhere during

19  Mr. Washington's testimony that he identified any of the

20  Defendants.  There was a vague reference to he thinks it might

21  have been Oswald, but there was no identification of any of the

22  Defendants.  All four Defendants are sitting here in the

23  courtroom.  Not once was there an identification made of any of

24  the officers involved in the incidents he described.  He didn't

25  discuss them by name in the course of each of the incidents.

1   And for that reason, we believe that there's an insufficiency of

2   evidence in this case.

3           THE COURT:  Okay.  Mr. Washington, essentially, what

4   Mr. Bradley's suggesting is that you at no point identified

5   Officers Farrier, Smith, and Stump during your testimony in this

6   case.  You did make a reference to Officer Oswald being one of

7   the participants in this.  But at no point did you identify any

8   of the other officers as having violated your constitutional

9   rights.  So I'll ask you if you have any response to that.

10          MR. WASHINGTON:  In my complaint, every one of these

11  are identified.  And during my testimony and his questioning, he

12  didn't ask did this one do that or ask for me to name either one

13  of them.  And plus, I think I specifically said it was one of

14  the sergeants that came to the door and one of them was

15  escorting me to the visiting room.

16          And if you want me to take the stand again and give

17  you these names, but the names are in the complaint.  And

18  they're here listed on this paper (indicating).  They wouldn't

19  be listed on the -- on the heading of this caption unless they

20  were cited for some reason there in the complaint.

21          THE COURT:  Well, as I mentioned to you when you were

22  on the stand, the complaint is not evidence in this case and

23  it's not a part of the record that goes to the jury.  And a

24  description of one of the sergeants does not provide any

25  specificity as to who the individuals were that were involved in

1    this case.

2            I did carefully listen to your testimony to see

3    whether at any point you would identify any of the officers who

4    were not mentioned at all, Officer Smith, Officer Stump, and

5    Officer Farrier, and you did not.

6            I'll allow the case to proceed against Officer Oswald

7    only at this point.  There's been no identification of the other

8    officers involved here.  There was no discussion of what their

9    involvement was, who they were.  No mention of their names even.

10   And so -- or certainly nothing that pointed out who they were in

11   the context of even sitting in the courtroom, that this was the

12   person who did X here.

13           You bear the burden of proof as to those issues.  You

14   did not meet your burden with respect to those issues; and

15   therefore, the action will be dismissed as to Officers Stump,

16   Smith, and Farrier.

17           So the only remaining action will be as to Officer

18   Oswald.  And we'll pick that up again tomorrow.  But that is

19   accurate.

20           MR. WASHINGTON:  Do I get a chance to say something

21   else?

22           THE COURT:  You can say what you'd like to, sure.

23           MR. WASHINGTON:  Well, no one asked me to -- you know

24   I'm a pro se litigator.

25           THE COURT:  The Defendant doesn't have to ask you

1    anything.  They could just sit there.  It's your burden of

2    proof.

3         MR. WASHINGTON:  But I don't see this in any

4    instructions or anything that I have to point them out.  There's

5    only one reason they was -- my complaint cites them.

6         THE COURT:  Your complaint is -- as I said to you on

7    the stand, your complaint is not evidence in this case.

8         MR. WASHINGTON:  You didn't -- I don't remember you

9    saying it while I was on the stand.

10        THE COURT:  Well, I did.  Yes.  But nevertheless, it's

11   your burden of proof.  This jury comes in, you provide them

12   evidence.  They don't know the complaint.  They've never read

13   the record.  They're not supposed to do that, in fact.  As I

14   told them, they can only consider what happens in this

15   courtroom.

16        MR. WASHINGTON:  Do I get a chance to amend -- you do

17   get a chance to amend your complaint.  Do I get to amend my

18   testimony?

19        THE COURT:  No.  You put on your case.  You just told

20   me your case is over.  That's your case.

21        MR. WASHINGTON:  I didn't -- this was said before

22   you --

23        THE COURT:  Yes, because you have the burden of

24   proving your case.

25        MR. WASHINGTON:  All right.  But if you let me know --

1          THE COURT:  I told you right out of the gate that it

2    is not up to me to give you instructions or to serve as your

3    lawyer in this case.  I told you that specifically this morning.

4          MR. WASHINGTON:  Yes, ma'am, you said all of those

5    things.  But now you're letting the villains -- you letting --

6    you're letting the villains get away on a technicality there.

7    They're getting away on a technicality.

8          They poked with me needles.

9          THE COURT:  Well, I understand what you're suggesting,

10   and certainly, it was your burden to demonstrate that these four

11   gentlemen over here did something to you.

12         And what I'm telling you right now is you may have

13   suggested that one person may have acted in that fashion towards

14   you, but you never even mentioned the other three.

15         MR. WASHINGTON:  And -- all right.  It's just that --

16   I don't think you would allow me to get away if they didn't name

17   me.  I just -- this is terrible that they're getting away with

18   having violated me and you're letting them get away with a

19   technicality.

20         And nobody asked me -- like, I understood what you

21   said to me.  It ain't their job to say this one did it to me.

22         THE COURT:  It's absolutely not their job; correct.

23         MR. WASHINGTON:  All right.  But had you -- if you

24   gave me an instruction that I must point them out, I would have

25   done that.

1        THE COURT:  It's not up to me to give you that

2   instruction.

3        MR. WASHINGTON:  They're getting away with doing that

4   to me.  And I'm sure they're laughing under their breaths of

5   having humiliated me.

6        THE COURT:  Well, your case proceeds against Officer

7   Oswald and Defendant will put on their case tomorrow in that

8   regard.

9        But Defendants are correct; at no point during your

10  time this afternoon did you present any evidence against the

11  remaining three officers in this case.

12       MR. WASHINGTON:  I want to preserve this as far as my

13  appeal rights.  Is this going to be -- I'm not -- I don't want

14  there to be a point where I get to appeal and they say you

15  didn't bring this up.

16       THE COURT:  Your objection to this is noted and you've

17  raised it.  But again, yeah.  I mean, I'll tell you this right

18  now.  I went back to the office and I thought you hadn't at all

19  ever mentioned the names of those three individuals.

20       MR. WASHINGTON:  I don't have a counselor.  You

21  wouldn't let me have a counselor.  They would have -- they would

22  have helped me.  I'm not -- I'm not -- I'm a pro se litigator,

23  and I have dementia.  He's letting them get away with this.

24       THE COURT:  All right.  Well, we'll continue our trial

25  tomorrow.  Officers Stump, Farrier, and Smith will be dismissed

1    from the case.  I will inform the jury of that.  And so the case

2    will proceed against Officer Oswald.  Okay.

3              MR. BRADLEY:  Thank you, Your Honor.

4              THE COURT:  All right.  Anything else about what we're

5    doing tomorrow?

6              MR. WASHINGTON:  They letting them get away with that.

7              THE COURT:  If not, we'll stand in recess.

8              Before we actually -- I did want to let everybody know

9    that we will be looking at the final jury instructions tomorrow.

10   David, if you wouldn't mind printing up a copy so that perhaps

11   Mr. Washington is able to take it with him.

12             And keep in mind, Mr. Washington, the way the jury

13   instructions are currently structured, the draft that we're

14   going to give you does include Officers Smith, Farrier, and

15   Stump, although those references will be removed once the jury

16   does get that.  I guess that's for everybody's purposes, okay,

17   just because we haven't had a chance to revise those.

18             MR. BRADLEY:  Understood.

19             THE COURT:  Okay.  All right.  We stand in recess.

20        (Proceedings adjourned at 4:07 p.m.)

21                               -  -  -

22

23

24

25

1                          C E R T I F I C A T E

2

3              I, SHARON SIATKOWSKI, RMR, CRR, CBC, CRI, certify that the
    foregoing is a correct transcript from the record of proceedings in the
4    above-entitled matter.

5    s/Sharon Siatkowski
    SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25